OPINION OF THE COURT
 

 Cooke, J.
 

 Consolidated Edison Company of New York, Inc., operates a nuclear generating plant, known as Indian Point Unit No. 2, in the Village of Buchanan, in Westchester County. The facility’s cooling system, up to now, has been a "once-through” system by which water is taken from the Hudson River to cool
 
 *604
 
 the condensers and then returned to the river. This method of cooling uses high quantities of water and, according to concerned citizens and organizations, is extremely destructive of fish and plant life in the river.
 

 An alternative to the once-through cooling system is a "closed-cycle” system which recirculates the water used to cool the condensor, requiring replenishment at times from the river in a limited amount to replace that which is lost by evaporation. This closed-cycle system is considered desirable by the intervenor in this matter, the Hudson River Fishermen’s Association, which, with others, has urged the discontinuance of the present cooling system before a Federal agency, the Atomic Energy Commission (now succeeded by the Nuclear Regulatory Commission) which licenses Indian Point Unit No. 2.
 

 After hearings concerning the cooling system used at Unit No. 2, on May 6, 1974, the AEC amended the plant’s license to read,
 
 inter alia,
 
 that "the once-through cooling system will be permitted during an interim period, the reasonable termination date for which now appears to be May 1, 1979.” (Recently, and after the commencement of the instant proceeding, this termination date was extended to May 1, 1982.) The amendment also required evaluation of the economic and environmental impacts of an alternative closed-cycle system to be made by Con Edison in order to determine a preferred system for installation. Further, it was contemplated that the termination date might be advanced or postponed depending on whether all governmental approvals were obtained by December 1, 1975.
 

 In accordance with the decision of the Atomic Safety and Licensing Appeal Board and the license as amended, Con Edison had prepared a report which concluded that, in a closed-cycle system, based on economic and environmental data, the preferred means of cooling is a natural draft, wet cooling tower. This would require the construction of a 565-foot tower in the Village of Buchanan. However, when Con Edison applied for a building permit, the application was denied by the village’s building inspector on the grounds that the size of the proposed tower exceeds the 40-foot height limitation in the zoning district, that a visible vapor plume emanating from the tower would extend beyond the boundary of the immediate site in contravention of section 54-22 of the Buchanan Zoning Ordinance, and that a saline draft would be
 
 *605
 
 deposited, also in violation of that section. Thereafter, Con Edison sought a variance from Buchanan’s Zoning Board of Appeals.
 

 In a lengthy decision, dated June 19, 1975, the zoning board of appeals, after reviewing the underlying controversy before the Federal Atomic Energy Commission (and now the Nuclear Regulatory Commission) concerning the cooling system used by Indian Point Unit No. 2, denied the application for a variance. Since Con Edison was continuing to study the ecological effect of the once-through cooling system, and was under no present direction by a regulatory agency to begin construction, the board took the view that no practical difficulties requiring a variance had been shown, concluding that the application was "contingent” and "pro forma”. The board also stated that if it were not denying the variances for the reasons stated, it would deny them on the ground that Con Edison had not shown that it was requesting the minimal variance which must be granted to preserve the spirit of the ordinance while protecting the public interest under section 7-712 (subd 2, par [c]) of the Village Law and thus that practical difficulties calling for a variance had not been established. In this respect, the board commented that the application precluded any consideration of alternatives, including any variations of the mechanical systems, which might be only 68 feet high, or any modification of the towers and adaptability of the technology of one system to the other to eliminate objectionable features, and merely called for acceptance of a natural draft system and a 565-foot tower as indispensable consequences of any closed-cycle system.
 

 This article 78 proceeding followed on July 17, 1975, with Con Edison seeking a judgment annulling the decision of the zoning board of appeals and directing it to issue the variance. Special Term, reasoning that pervasive Federal regulation of Con Edison’s facility necessitates a finding of implied preemption, granted the petition to the extent of enjoining the board from enforcing or attempting to enforce the provisions of the Buchanan Zoning Ordinance as against construction of a closed-cycle cooling system at Indian Point Unit No. 2. The Appellate Division not only agreed with Special Term that denial of the variance contravened Federal law, but also concluded that State law was violated (see Public Service Law, § 65, subd 1; Transportation Corporations Law, § 11), and then modified by directing the board to issue the variance for
 
 *606
 
 construction of the tower, stating that the respondents may regulate local and incidental conditions relative to the construction of the proposed facility. We granted leave to appeal to this court and affirm on more limited State-law grounds.
 

 At the outset, we note that issues of Federal pre-emption are raised with differing emphases by the original parties, the intervenor, and
 
 amici.
 
 These issues need not and should not be reached. Con Edison asserts that the decision of the zoning board of appeals was erroneous, arbitrary and capricious. Hence, reducing the case to its simplest terms, the legal issue before this court is whether, based on the evidence presented, the board abused its discretion, as a matter of law, in denying Con Edison’s application for a variance. Since this question is capable of resolution under our own State law, we should not decide broad questions not necessary to the resolution of the present dispute but, rather, approach this case with a narrower focus.
 

 Starting with basics, where there are practical difficulties or unnecessary hardships in the way of carrying out an ordinance, a zoning board of appeals has the power to issue a variance (Village Law, § 7-712, subd 2, par [c]). Depending on the type of variance sought, a distinction in the burden placed on the applicant has developed (see 2 Anderson, New York Zoning Law and Practice [2d ed], § 18.07). To be granted an area variance, the applicant must satisfy the less demanding standard of showing that strict compliance with the zoning law will cause "practical difficulties” (see, e.g.,
 
 Matter of Wilcox v Zoning Bd. of Appeals of City of
 
 Yonkers, 17 NY2d 249, 255;
 
 Matter of Village of Bronxville v Francis,
 
 1 AD2d 236, affd 1 NY2d 839). On the other hand, since a prohibited use, if permitted, will result in a use of the land in a manner
 
 inconsistent
 
 with the basic character of the zone, a heavier burden is placed on the applicant (see
 
 Conley v Town of Brookhaven Zoning Bd. of Appeals,
 
 40 NY2d 309, 313-314) and the enabling act has been construed to require a showing of "unnecessary hardship” (see, generally, 2 Anderson, New York Zoning Law and Practice [2d ed], § 18.32). However, even in the case of an area variance, a significant factor is the magnitude of the variance sought, since the greater the deviation the more likely it is that the impact on the community will be severe (see
 
 Matter of National Merritt v Weist,
 
 41 NY2d 438, 441).
 

 An "area” variance is one which does not involve a use
 
 *607
 
 which is prohibited by the zoning ordinance, while a "use” variance is one which permits the use of land which is proscribed
 
 (Matter of Overhill Bldg. Co. v Delany,
 
 28 NY2d 449, 453; 3 Anderson, American Law of Zoning [2d ed], §§ 18.06-18.07). In the instant matter, in addition to an area variance to accommodate the height of the tower, the village asserts that operation of the tower will result in prohibited uses for which variances are necessary. The proscribed uses are that the cooling tower will produce a vapor plume from which, depending on the salt content of the river at any given time, a saline drift may be deposited on the locale and be harmful to some types of trees.
 
 [1]
 
 Hence, as noted, where a use variance is sought, the applicant must show unnecessary hardship.
 

 To establish unnecessary hardship, the traditional approach has been to require the applicant to show that the land cannot yield a reasonable return if used only for a purpose allowed in the zone, that the circumstances which cause the hardship are unique to the land and not to general neighborhood conditions, and that the requested use will not alter the essential character of the locality (see
 
 Matter of Otto v Steinhilber,
 
 282 NY 71, 76). It has been observed, however, that these requirements are not appropriate where a public utility such as Con Edison seeks a variance, since the land may be usable for a purpose consistent with the zoning law, the uniqueness may be the result merely of the peculiar needs of the utility, and some impact on the neighborhood is likely (2 Anderson, American Law of Zoning [2d ed], § 12.31, pp 474-475; see, generally, 3 Rathkopf, Law of Zoning and Planning, ch 72, [3d ed]).
 

 This analysis is borne out by the fact that the courts have placed emphasis on the public necessity when considering a utility’s application for a variance (see
 
 Matter of Long Is. Light. Co. v Griffin,
 
 272 App Div 551, esp 553, affd 297 NY 897; see, also, Note, Zoning and the Expanding Public Utility, 13 Syracuse L Rev, 581, 583-584; see, generally, 67 NY Jur,
 
 *608
 
 Zoning and Planning Laws, § 191). Local concerns, though important, are not the sole criteria, since utilities such as Con Edison, a gas, electric and steam corporation, are required to "provide such service, instrumentalities and facilities as shall be safe and adequate and in all respects just and reasonable” (Public Service Law, § 65, subd 1). Indeed, consideration of the needs of a broader public are reasonably within the contemplation of the enabling legislation, which authorizes a zoning board to grant a variance "so that the spirit of the local law or ordinance shall be observed, public safety and welfare secured and substantial justice done” (Village Law, § 7-712, subd 2, par [c]). Thus, in resolving the question of hardship, the effect on the utility’s customers is a significant factor to be considered by local zoning boards.
 

 Having reviewed what must be presented to and considered by the local zoning board, the issue is whether the zoning board erred in its decision to deny the variance. Since the zoning board is given discretion in these matters, the court’s function is limited, and a board determination may not be set aside in the absence of illegality, arbitrariness or abuse of discretion
 
 (Matter of Cowan v Kern,
 
 41 NY2d 591, 598;
 
 Conley v Town of Brookhaven Zoning Bd. of Appeals,
 
 40 NY2d 309, 314,
 
 supra).
 
 The board’s determination will be sustained if it has a rational basis and is supported by substantial evidence
 
 (id.;
 
 see, also,
 
 Matter of National Merritt v Weist,
 
 41 NY2d 438, 443,
 
 supra).
 
 Even where a utility is involved, the courts function under the same limited standard of review (see
 
 Matter of Long Is. Light. Co. v Griffin,
 
 272 App Div 551, affd 297 NY 897,
 
 supra;
 
 cf.
 
 Matter of Long Is. Light. Co. v City of Long Beach,
 
 280 App Div 823).
 

 At the hearing before the Buchanan Zoning Board of Appeals, Con Edison expressed its concern that, if the Nuclear Regulatory Commission adhered to its requirement that Indian Point Unit No. 2 terminate operation of a once-through cooling system and the village stuck to its position of not allowing construction of the cooling tower, the utility could be faced with the necessity of shutting down Unit No. 2, which has a capital cost in excess of $204,000,000. The board was presented with testimony that the operation of the plant saved Con Edison customers $78,000,000 in fuel expense in 1974, and that if the facility were closed down additional fuel costs to make up the lack of generation by increasing production at its other plants, all of which burn imported oil, would
 
 *609
 
 translate to $567,000 per day. In terms of oil use, in 1974 alone, the operation of Indian Point Unit No. 2 saved approximately 7,300,000 barrels of oil or equivalently 306,600,000 gallons.
 

 In view of the potential hardship to Con Edison’s approximately three million customers, and millions of others affected, not to mention the harm to the utility’s huge investment and the taxes paid, the board’s decision to treat the application as contingent or pro forma was unwarranted. Although the license amendment from the agency which regulates the plant contemplated that the termination date might be changed, a reading of the relevant documents and decisions manifests that the right to operate would be terminated upon failure to convert to a closed-cycle system. Since it was estimated that excavation and construction might take years, there was no justification for delaying commencement of the project. Moreover, the board recognized that Con Edison itself had objected to the increased expense resulting from a contemplated $84,000,000 construction cost and a $35,000,000 annual operating budget, and thus there was no need to fear that Con Edison would begin the project prematurely or before it was absolutely necessary. Considering the enormous social and economic significance of this application for a variance and the tremendous ensuing loss if the plant ultimately were forced to close down, it is difficult to imagine a more arbitrary and capricious manner of resolving the dispute. Based on the evidence presented of hardship to Con Edison and its customers, there is more than an ample basis for concluding that the Buchanan Zoning Board of Appeals abused its discretion in denying the variance sought.
 

 Comment should also be made concerning the zoning board’s suggestion that the application was defective because it did not present alternatives to a natural draft, wet cooling tower. Con Edison was directed to evaluate the economic and environmental impacts of a closed-cycle system in order to determine a preferred system for installation. Based on its studies, the utility concluded that mechanical draft wet towers were unacceptable environmentally because that type of system would double the fog and icing conditions prevalent in the area, and would violate the noise prohibitions of the Buchanan code. Alternatively, mechanical draft wet/dry towers were also considered more harmful to the environment than
 
 *610
 
 the natural draft, wet cooling tower for which a variance was sought.
 
 [2]
 

 While ordinarily a village may properly decide for itself which of several evils it should bear, this is not such an instance. The zoning board had the opportunity to present its position before the regulatory agency which directed the evaluation by Con Edison. It thus had an appropriate forum to voice its environmental concerns and should not have used the local proceedings to express its dissatisfaction. There is no indication of any lack of good faith by Con Edison in its conclusion as to the most acceptable system from an environmental standpoint. Indeed, considering that the area is zoned for industrial use and that other industrial facilities are located nearby, concern over the environmental effect of a vapor plume from the proposed tower appears greatly exaggerated.
 

 As for aesthetics, the zoning board also expressed concern that the 565-foot tower would be an eyesore. The zone, however, includes the two domed containment buildings of Indian Point Units Nos. 2 and 3, which are 219-feet high, and a stack for the Unit No. 1 superheater building which is 375-feet high. Although these structures are pre-existing uses, construction of which was commenced prior to adoption of the present zoning code, since these facilities also greatly exceed the height limitations, the specter of the tower is substantially dissipated.
 

 In conclusion, it has long been held that a zoning board may not exclude a utility from a community where the utility has shown a need for its facilities (see
 
 Matter of Long Is. Light. Co. v Griffin,
 
 272 App Div 551,
 
 supra; Matter of Long Is. Water Corp. v Michaelis,
 
 28 AD2d 887). However, this has never meant that a utility may place a facility wherever it chooses within the community (see
 
 Matter of Niagara Mohawk Power Corp. v City of Fulton,
 
 8 AD2d 523;
 
 Matter of Long Is. Light. Co. v Incorporated Vil. of East Rockaway,
 
 279 App Div 926; see, also, Public Service Law, art 8, § 140
 
 et seq.).
 

 The question here is not one of siting a plant, but simply the need to modify the existing facility (see
 
 Matter of
 
 
 *611
 

 Long Is. Light. Co. v City of Long Beach,
 
 280 App Div 823,
 
 supra; Northport Water Works Co. v Carll,
 
 133 NYS2d 859). To be granted such a use variance, the utility should be required to show that denial of the variance would cause unnecessary hardship, but not in the sense required of other applicants (see
 
 Matter of Otto v Steinhilber,
 
 282 NY 71, 76,
 
 supra).
 
 Instead, the utility must show that modification is a public necessity in that it is required to render safe and adequate service, and that there are compelling reasons, economic or otherwise, which make it more feasible to modify the plant than to use alternative sources of power such as may be provided by other facilities. However, where the intrusion or burden on the community is minimal, the showing required by the utility should be correspondingly reduced (cf.
 
 Matter of Long Is. Light. Co. v Griffin,
 
 272 App Div 551, esp 554, affd 297 NY 897,
 
 supra; Matter of Long Is. Light. Co. v City of Long Beach,
 
 280 App Div 823,
 
 supra).
 
 In this matter, Con Edison has made a striking and more than ample demonstration of hardship and need, the reasons for denying its application were arbitrary and capricious, and hence the zoning board’s decision to prohibit the variance was an abuse of discretion.
 

 Accordingly, for the reasons stated, the order of the Appellate Division should be affirmed, with costs.
 

 Chief Judge Breitel and Judges Jasen, Gabrielli, Jones, Wachtler and Fuchsberg concur.
 

 Order affirmed.
 

 [1]
 

 . In the zone where Con Edison’s facility is located there is a prohibition against: "Dissemination of noise, vibration, odor, dust, smoke, observable gas or fumes, or other atmospheric pollutants beyond the boundaries of the immediate site of the building in which such use is conducted” (Code of Village of Buchanan, § 54-22, subd A [1]).
 

 In addition, the ordinance prohibits any use which will cause or result in "[h]azard of fire or explosion or other physical hazard to any person, building or vegetation” (subd A [2]), or "[a] harmful discharge of waste materials” (subd A [4]).
 

 [2]
 

 . Subsequently, the facility’s license was again amended and is now consistent with Con Edison’s study. The license, as amended, reads: "The Nuclear Regulatory Commission has determined * * * that a closed-cycle natural draft, wet cooling tower system is the preferred alternative closed-cycle cooling system for installation at Indian Point Unit No. 2.”