52 N.Y.2d 963 (1981)
SCA Chemical Waste Services, Inc., Respondent,
v.
Board of Appeals of the Town of Porter et al., Appellants.
Court of Appeals of the State of New York.
Argued January 6, 1981.
Decided February 12, 1981.
George A. Orr, Jr., for appellants.
H. Kenneth Schroeder, Jr., Stephen H. Kelly and Anne S. Simet for respondent.
Concur: Judges JONES, WACHTLER, FUCHSBERG and MEYER. Judge GABRIELLI dissents and votes to reverse in an opinion in which Chief Judge COOKE and Judge JASEN concur.
Order affirmed, with costs, for reasons stated in the opinion by Mr. Justice JOHN J. CALLAHAN at the Appellate Division (75 AD2d 106).
GABRIELLI, J. (dissenting).
I am required to dissent for I believe that the majority errs in affirming the determination of the Appellate Division, which held that a large pipeline carrying hazardous industrial waste water from an industrial waste disposal plant is not an impermissible industrial activity within the meaning of the zoning laws of the Town of Porter. As demonstrated below, such a pipeline can be nothing but an industrial activity, and should therefore properly be prohibited from traversing the agricultural, residential and environmental zones of the town.
Petitioner SCA Chemical Waste Services, Inc., is engaged in the business of disposing of vast amounts of hazardous industrial waste. In 1974 the State Department of Environmental Conservation granted permission to petitioner for the discharge of treated waste water in the Niagara River. In 1978, petitioner's discharge permit was amended to allow it to discharge the effluent into a nearby creek which runs into the river, provided that a 20:1 dilution ratio of water to effluent was maintained. However, *966 this was unworkable since the creek proved to be too small and petitioner found it impossible to dispose of a significant amount of effluent while maintaining the required dilution factor. By 1979, petitioner's storage facilities were in danger of becoming completely inadequate, and petitioner thereupon proposed building a pipeline to carry the effluent from its plant to the river, a distance of approximately five miles. An application was approved by the Department of Environmental Conservation. Since the projected route of the pipeline was to pass through the Town of Porter, petitioner applied to the town for (1) excavation, (2) construction, and (3) special use permits. The town rejected the applications on several grounds, concluding first that the pipeline activity, including the treatment of the waste and effluent, the construction of the pipeline and its patrolling and maintenance was an industrial use not permitted by the provisions of the zoning regulations governing the area through which the pipeline was to pass. Additionally the board concluded that the pipeline presented an unacceptable danger to public health and the environment.
The instant article 78 proceeding to challenge that determination ensued. Special Term rejected the finding that the pipeline would be a danger, but concluded that the board had not acted improperly in denying the application on the ground that the pipeline was a forbidden industrial use. On petitioner's appeal to the Appellate Division, that court reversed and concluded that the petitioner was entitled to the permits because a "pipeline" is not an industrial use. A majority of this court now affirms on the opinion at the Appellate Division.
Petitioner has not attacked the validity of the zoning ordinance  only its application. In enacting its ordinance in 1968, the Town of Porter specifically sought to and did exclude industrial activity from its agricultural, residential and environmental zones. The particular nature of the petitioner's business, the nature of the fluid to flow through the pipeline in relation to that business and its deleterious effect upon residential and agricultural uses of the land, mandate that the order of the Appellate Division be reversed.
Petitioner's business is to treat, store and dispose of *967 hazardous industrial solid and liquid wastes. The proposed pipeline will form an integral part of that disposal process and is to be used only for industrial purposes. That no treatment of wastes takes place within the pipeline does not mean that use of the pipeline is not part of the industrial process. Indeed, the conclusion that the pipeline is not an industrial activity because it is simply a vehicle for transporting material after completion of the treatment process presents a nearsighted view of this unique situation. The waste treatment and its disposal are integrated parts of a single process which is not complete until the waste is actually dumped.
It is of consuming interest to note that this court has held that an access road or driveway over and on a residential lot for access to a commercial parking garage on an adjacent business lot was actually a part and parcel of the business of garaging vehicles, the use of which could be enjoined as nonresidential (City of Yonkers v Rentways, Inc, 304 N.Y. 499). This case closely parallels the present situation. Just as an access road leading to a commercial garage has been considered to be part of a business use, so too must a pipeline used exclusively as a conduit for effluent emanating from a waste treatment plant be considered an industrial use. Indeed, as then Judge FULD wrote for an unanimous court: "The power to regulate `trades and industries' obviously includes the power to regulate any part or portion of a trade or industry" (City of Yonkers v Rentways, Inc, 304 N.Y. 499, 503).
That the pipeline itself is below the surface does not alter the use to which the land is being put. As part of the control process and in order to measure any adverse environmental impact emanating from undetected leakage petitioner will use monitoring wells, aboveground air relief valves and manholes, and will also patrol the line. This surface and under-surface use of land must be viewed as incompatible with the agricultural, residential and environmental reserve districts through which the five-mile line will pass. Finally, although the Department of Environmental Conservation concluded that the pipeline could be built, its final report listed as an unavoidable negative impact the potential development of undetected leaks which *968 could mix with groundwater and soil and remain undetected until the effluent surfaced. The pipeline's metering system was designed to detect leakage above 14 gallons per minute, which would translate to undetected leakage of 840 gallons per hour or 20,160 gallons per day. It cannot be disputed that such activity would serve to hinder the development of the uses for which the agricultural, residential and environmental zones were properly designed.
Accordingly, and for all of the foregoing reasons, the order of the Appellate Division should be reversed.
Order affirmed, etc.