In the Matter of ALEXANDER E. ZAGOREOS et al., Respondents, v LUCIEN H. CONKLIN et al., Respondents, and ORANGE AND ROCKLAND UTILITIES, INC., Intervenor-Appellant. (Proceeding No. 1.)

In the Matter of ALEXANDER E. ZAGOREOS et al., Respondents, v ALFRED LINDSELL et al., Respondents, and ORANGE AND ROCKLAND UTILITIES, INC., Intervenor-Appellant. (Proceeding No. 2.)

In the Matter of ORANGE AND ROCKLAND UTILITIES, INC., Appellant, v LUCIEN H. CONKLIN et al., Respondents, and ALEXANDER E. ZAGOREOS et al., Intervenors-Respondents. (Proceeding No. 3.)

In the Matter of ORANGE AND ROCKLAND UTILITIES, INC., Appellant, v ALFRED LINDSELL et al., Respondents, and ALEXANDER E. ZAGOREOS et al., Intervenors-Respondents. (Proceeding No. 4.)

Second Department, July 1, 1985

### APPEARANCES OF COUNSEL

*LeBoeuf, Lamb, Lieby & MacRae* (*G. S. Peter Bergen, Kimba M. Wood, Mary Jo Eyster, Molly S. Boast* and *Dennis P. Harkawik* of counsel), for appellant and intervenor-appellant in the above-entitled proceedings.

*Doig, Cornell & Mandel* (*J. Martin Cornell* of counsel), for petitioners-respondents and intervenors-respondents in the above-entitled proceedings.

### OPINION OF THE COURT

LAZER, J. P.

At issue here are the efforts of Orange and Rockland Utilities, Inc. (O & R) to obtain municipal approval for the construction of several structures necessary to effectuate conversion of two oil-burning generating units into coal-burning units at its Lovett Plant in the Town of Stony Point. The proposed conversion was included in the State Energy Master Plan (SEMP) and O & R was successful in obtaining approval of a final environmental impact statement (FEIS) as well as several necessary permits from the Department of Environmental Conservation (DEC). The validity of the DEC decision was previously before this court and was upheld (*Matter of Environmental Defense Fund v Flacke,* 96 AD2d 862). The permits issued and the FEIS approval by the DEC envisioned the installation of various pollution

control devices, including a 475-foot smokestack, two electrostatic precipitators, ash silos and wastewater treatment facilities.

Because the proposed construction involved the extension of a prior nonconforming use located in a general flood plain zone and would also violate the town zoning ordinance with respect to lot width, lot coverage, minimum side yard, minimum rear yard and height to yard ratio, use and area variances were a prerequisite to any construction by O & R. Furthermore, since the site was larger than one acre, a large scale development permit from the Town Board was also necessary. As these appeals derive from O & R's inability to obtain and retain the requisite variances and permit, resolution of the issues requires us to examine the always delicate balance between the right of a public utility to modify its operation where necessary to properly serve the public and the power of a locality to regulate such modification. Initially, however, we must determine whether certain proceedings before the Zoning Board of Appeals (ZBA) and the Town Board were fatally tainted by a conflict of interest arising from the participation in these proceedings of several employees of O & R who were also members of those public bodies.

I

To briefly summarize a procedural morass of substantial proportions, after the town building inspector denied its request for a building permit, O & R applied to the ZBA for the requisite variances and to the Town Board for a development permit. On August 5, 1982, the ZBA voted on the variance application despite the fact that its chairman had previously notified O & R that the matter was being removed from the agenda because no recommendation concerning the conversion project had yet been forwarded by the Rockland County Planning Board (*see,* General Municipal Law § 239-m). Nevertheless, during the ZBA meeting a member of the public told the Board members that the County Planning Board had recommended disapproval that very day and the ZBA acceded to vociferous requests that, although no official representative of O & R was present, it vote on the matter immediately. The vote was 4-to-2 in favor of the variance application. Despite this, the measure was deemed defeated because a variance could not be approved over an adverse recommendation by the County Planning Board unless a majority plus one of the seven-member ZBA voted in favor of it (*see,* General Municipal Law § 239-m).

Reasoning that the 4-to-2 vote taken on August 5, 1982 was a nullity because of the lack of notice to O & R, the ZBA decided to

reconsider the matter without holding another public hearing. Before any further vote of the ZBA, the County Planning Board issued a decision recommending rejection of the project; however, upon submission of additional information which the ZBA had originally failed to forward to it, the County Planning Board reconsidered the matter and then voted 3-to-3 on the approval resolution. This tie vote resulted in the County Planning Board informing the ZBA that it was making no recommendation on the proposal. As a result, the variance application could be approved by a simple majority of four. On September 30, 1982, the ZBA approved the application by a 5-to-2 vote. Several residents of Stony Point and interested groups (the residents) then commenced a CPLR article 78 proceeding (proceeding No. 2) to challenge the issuance of the variances. Special Term set aside the September 30 vote on the ground that 2 of the 5 ZBA members who had voted in favor of O & R's application were employees of O & R and thus the proceeding was tainted by an improper conflict of interest. O & R, which was allowed to intervene in the proceeding, appeals from that judgment.

The ZBA did not appeal, however, and instead reconsidered the application. On July 21, 1983, with the two O & R employees abstaining, the ZBA voted 3-to-1 in favor of the application. Since the three favorable votes did not constitute a majority of the seven-person ZBA, the application was defeated. O & R then commenced an article 78 proceeding (proceeding No. 4) contesting the denial. The residents were permitted to intervene and cross-moved for a judgment declaring the denial to be valid. Special Term denied O & R's request and granted the residents' application for declaratory relief. O & R also appeals from that judgment. Although the ZBA has elected not to file a brief on appeal, the residents have done so.

The application to the Town Board for a large scale development permit met essentially the same fate. On October 5, 1982, the five-member Town Board voted 3-to-2 in favor of the application, without referring it to the County Planning Board. One member of the Town Board who voted in favor of the permit was an O & R employee. The residents then commenced an article 78 proceeding contesting the Town Board's action (proceeding No. 1). That decision was nullified by Special Term on the ground of conflict of interest, and O & R, which had been allowed to intervene, appeals from that judgment as well. This time it was the Town Board that chose to reconsider the application on remittitur rather than appeal. With the O & R employee abstaining, the application was defeated by a 2-to-2 vote on August 9, 1983. O & R commenced an article 78 proceeding challenging

the denial (proceeding No. 3). Once again, the residents intervened seeking a declaration that the Board's action was valid. Special Term denied O & R's request that it nullify the Board's determination and instead rendered a judgment declaring the action to be valid. O & R's appeal from this judgment also is before us and is opposed by the residents. The Town Board has not filed a brief.

## II

At the outset, we note that the ZBA correctly decided that its original August 5, 1982 vote was a nullity. This was so both because O & R had been deprived of an opportunity to appear at that proceeding (see, Town Law § 267; 2 Anderson, New York Zoning Law and Practice §§ 25.08, 25.09 [3d ed]) and because the ZBA lacked jurisdiction to determine the matter until it had received the written recommendation and statement of reasons from the County Planning Board or 30 days had passed without a response from that body (see, General Municipal Law § 239-m; Matter of Voelckers v Guelli, 58 NY2d 170, 175-176; Matter of Asma v Curcione, 31 AD2d 883; Bloom v Town Bd., 80 AD2d 823, 824-825; 2 Anderson, New York Zoning Law and Practice § 19.09, at 34 [3d ed]). Under the circumstances, it was proper for the ZBA to reconsider the matter without a rehearing such as would have been required had the prior vote been effective (see, Town Law § 267 [6]). Accordingly, we turn directly to the question of whether the September 30, 1982 determination of the ZBA granting the variances and the October 5, 1982 vote of the Town Board approving the large scale development permit application were fatally tainted by the fact that in both cases the decisive votes were cast by Board members who were also employees of O & R. We conclude that Special Term was correct in setting aside those determinations because of the perceived conflict of interest.

At the September 30, 1982 meeting of the ZBA, the decisive votes in favor of O & R's application were cast by two ZBA members who were employed by O & R as a repairman and a supervisor of rubber goods testing, respectively. Similarly, the determinative vote at the October 5, 1982 Town Board meeting was cast by an O & R training administrator. O & R correctly contends that these individuals did not act in violation of the specific provisions of General Municipal Law article 18 dealing with conflicts of interest by municipal officers and employees. Nonetheless, O & R itself appears to have violated General Municipal Law § 809, which, inter alia, requires that every application for a variance list the name of any municipal officer

or employee who is also an employee of the applicant. The record does not indicate that such information was provided on O & R's applications. The employment status of the three O & R employees was disclosed prior to the votes, however, and in the absence of a real or significant appearance of a conflict of interest, we would not deem such a purely technical violation of the statute to be a fatal defect, standing alone (*cf. Glen Head-Glenwood Landing Civic Council v Town of Oyster Bay,* 109 Misc 2d 376, 389-390, *affd on other grounds* 88 AD2d 484).

It is not necessary, however, that a specific provision of the General Municipal Law be violated before there can be an improper conflict of interest. Thus, we have previously held that an officer of an advertising firm could not vote on a zoning application by a subsidiary of one of his firm's clients, despite the absence of any interest specifically forbidden by the provisions of the General Municipal Law (*Matter of Tuxedo Conservation & Taxpayers Assn. v Town Bd.,* 69 AD2d 320). Similarly, it has been held in other jurisdictions that it is improper for a zoning board member to vote on an application by his or her employer (*see, e.g., Aldom v Borough of Roseland,* 42 NJ Super 495, 127 A2d 190; *see generally, Disqualification for Bias or Interest of Administrative Officer Sitting in Zoning Proceeding,* 10 ALR3d 694 § 4, at 699-702).

Moreover, pursuant to the provisions of General Municipal Law § 806, the Town of Stony Point has promulgated a Code of Ethics more stringent than the specific provisions of the statute. The preamble of the code provides a clear statement of its broad scope and intent to ensure that "the public have confidence in its Town Government, that public office shall not be used for personal profit, and that its public officials must be independent and impartial in their actions" and to prevent "a potential or actual conflict of interest between the private interests of an official, and his duties as such an official".

Relevant to the controversy before us is part B of the code, which provides: "No officer or employee of the Town of Stony Point shall accept other employment, or make any investment, which will impair his independence of judgment or interfere in any manner, with the exercise or discharge of their [*sic*] official duties."

■ Although the mere fact of employment might not require disqualification in every instance, we conclude that under the circumstances of these proceedings, the failure of the three O & R employees to disqualify themselves was improper. In light of the unusual nature of the applications and the substan-

tial controversy surrounding the matter, it was crucial that the public be assured that the decision would be made by town officials completely free to exercise their best judgment of the public interest, without any suggestion of self-interest or partiality. Anything less would undermine the people's confidence in the legitimacy of the proceedings and the integrity of the municipal government. As we stated in *Matter of Tuxedo Conservation & Taxpayers Assn.* (69 AD2d 320, 325, *supra*): "[T]he test to be applied is not whether there is a conflict, but whether there might be. Thus, in *Mills v Town Planning & Zoning Comm. of Town of Windsor* (144 Conn 493, 498), the court said: 'It is the policy of the law to keep the official so far from temptation as to ensure his unselfish devotion to the public interest'."

The importance of this project to O & R is obvious. Equally so are those subtle but powerful psychological pressures the mere knowledge of that importance must inevitably place upon any employee of the utility who is in a position to either effectuate or frustrate the project and who is concerned for his or her future with the company. Any attempt to disregard these realities would be senseless, for the public is certainly aware of them. Of course, we do not suggest that O & R did in fact attempt to improperly influence the three individuals involved, either by promise of reward or threat of punishment. Human nature being what it is, however, it is inconceivable that such considerations did not loom large in the minds of the three. Under these circumstances, the likelihood that their employment by O & R could have influenced their judgment is simply too great to ignore. Hence, we conclude that the September 30 decision of the ZBA and the October 5 decision of the Town Board were correctly set aside due to an improper conflict of interest. We turn now to the substance of O & R's claim that the subsequent denials of the requisite variances and permit were arbitrary and capricious.

### III

■ As to the proceedings before the ZBA, the proposed construction required both area and use variances. Because a use variance was necessary, O & R was required to prove unnecessary hardship, not merely practical difficulty (*see*, 2 Anderson, New York Zoning Law and Practice § 23.03 [3d ed]). Since we conclude that O & R did not meet that burden and thus cannot in any event obtain the necessary use variance, it is unnecessary to determine whether it would have been entitled to the area variances alone.

*Matter of Otto v Steinhilber* (282 NY 71) enunciated the traditional standard of reference for determining whether a use variance case has been made out. The oft-repeated elements are a showing that limiting the land to the permitted uses would prevent the landowner from obtaining a reasonable return, that the circumstances creating the hardship are unique to the particular parcel, and that the requested use will not alter the basic character of the area. Although strict application of the second factor, that of uniqueness, is no longer required in all cases (*see, Matter of Douglaston Civic Assn. v Klein,* 51 NY2d 963; *Matter of Jayne Estates v Raynor,* 22 NY2d 417), the test remains a stringent one. Strict application of the *Otto* standard to public utilities would likely bar them from ever obtaining use variances, for the land involved is often useable for other purposes, the hardship generally stems from the needs of the utility rather than being unique to the property, and the facilities involved will normally have an impact on the character of the locality (*see,* 1 Anderson, New York Zoning Law and Practice § 11.24, at 564-565 [3d ed]; *Matter of Consolidated Edison Co. v Hoffman,* 43 NY2d 598, 607). Precluding public utilities from obtaining use variances, however, might prevent them from performing their mandate to provide "safe and adequate" service to the public (*see,* Public Service Law § 65 [1]). Accordingly, a somewhat different standard is applicable when the unnecessary hardship test becomes relevant to a public utility's effort to obtain a use variance.

Although a municipality is not free to prevent a utility from providing necessary services by application of its zoning powers, neither may a utility simply disregard the local ordinances. Rather, a balance must be maintained between those interests of the locality which can be expressed by zoning ordinances and the needs of the community which must be served by the utility. Thus, in *Matter of Consolidated Edison Co. v Hoffman* (43 NY2d 598, 611, *supra*), the Court of Appeals declared that to establish unnecessary hardship justifying a use variance for the modification of an existing power plant, a public utility must prove "that modification is a public necessity in that it is required to render safe and adequate service, and that there are compelling reasons, economic or otherwise, which make it more feasible to modify the plant than to use alternative sources of power such as may be provided by other facilities." Applying the *Consolidated Edison* standard to the controversy before us, in order to establish its right to a use variance O & R was required to show both that coal conversion was necessary to provide safe and adequate service and that the particular modifications with respect to

which the variance was sought were a necessary part of that conversion. Assuming this burden could be met, it would then be necessary to show the existence of "compelling reasons" why whatever threat to O & R's ability to provide safe and adequate service would result from a denial of the use variance could not be avoided by some other action. As it is, however, O & R never met its initial burden and thus was not entitled to a variance.

Before the ZBA, O & R took the position that while the standard set forth in *Consolidated Edison* (*supra*) was the normal test for a public utility seeking a use variance, the instant application was unique because the Lovett conversion project was included in the State Energy Master Plan and because O & R had obtained DEC approval of the FEIS and various permits allowing construction and operation of the pollution control devices with respect to which the variance was sought. It was O & R's position that inclusion of the Lovett conversion project in the master plan constituted a mandatory expression of State policy, binding upon both O & R and the municipality, and thus the ZBA was required to issue whatever variances were necessary for the conversion. On the question of whether the structures for which the variances were sought were necessary for the conversion, O & R argued that it could not make the conversion without DEC approval, and DEC approval had been obtained subject to the construction of those pollution control devices. Hence, construction of the devices was necessary for the conversion, and O & R was entitled to the variances. In support of its application, O & R submitted the page of the State Energy Master Plan which listed the Lovett conversion project, the FEIS and related material, and charts provided by O & R indicating that conversion to coal would result in considerable savings to O & R's ratepayers. No attempt was made to show that conversion was actually necessary for O & R to continue to provide safe and adequate service or that O & R would be unable to provide safe and adequate service if compelled to forego modification of the facility and continue to burn oil. Instead, O & R elected to prove only (1) that the conversion was included in the State Energy Master Plan, and (2) that the conversion would result in considerable savings. As to the possible negative environmental effects of the conversion, it was O & R's position that the ZBA was precluded from even considering such matters by virtue of the decisions by the DEC.

Promulgation of a State Energy Master Plan was authorized by Energy Law former § 5-110 and Energy Law § 3-101 (former 7) (L 1978, ch 707, §§ 2, 3). These provisions required the Energy Office to prepare a draft State Energy Master Plan to "provide

the framework for energy related decisions made throughout the state" (L 1978, ch 707, §§ 2, 3). Upon approval by the State Energy Planning Board, which was created by Energy Law § 1-103 (former 1-a) (L 1978, ch 707, § 1), the draft plan became the State Energy Master Plan (SEMP) (L 1978, ch 707, § 3). The SEMP was not a static document, however, since former section 5-110 also required that it be comprehensively reviewed and updated every two years (L 1978, ch 707, § 3).

Pursuant to this legislation, in 1980 the first State Energy Master Plan was approved by the Energy Planning Board (SEMP I), a revised State Energy Master Plan was approved in 1982 (SEMP II), and the State Energy Office proposed another revision in 1983. No SEMP III was ever approved, however, because the legislation creating the Energy Planning Board and authorizing the promulgation of a State Energy Master Plan expired by its own terms on January 1, 1984 (L 1978, ch 707, § 8). To date, the Legislature has not seen fit to enact legislation continuing or replacing this experiment in long-term planning.

Whatever the significance of the SEMP when O & R's application was before the ZBA, no SEMP now exists, and in the absence of special factors not here present, this court must apply the law as it presently exists (*see, Matter of Alscot Investing Corp. v Board of Trustees,* 64 NY2d 921, *affg* 99 AD2d 754; *Matter of Mascony Transp. & Ferry Serv. v Richmond,* 49 NY2d 969, *affg* 71 AD2d 896; *Matter of Demisay, Inc. v Petito,* 31 NY2d 896). O & R has obtained no vested interest in the Lovett conversion project, for construction has not begun, nor has there been any showing of bad faith on the part of State or local authorities (*cf. Matter of Faymor Dev. Co. v Board of Stds. & Appeals,* 45 NY2d 560; *Matter of Pokoik v Silsdorf,* 40 NY2d 769; *Matter of Temkin v Karagheuzoff,* 34 NY2d 324). Moreover, neither the SEMP nor the enabling legislation may be said to have conferred any substantive rights upon O & R which might have survived expiration of the statute and the plan (*cf.* General Construction Law §§ 93, 94; *see generally,* McKinney's Cons Laws of NY, Book 1, Statutes §§ 411, 412). Therefore, the expiration of these provisions vitiates the continuing viability of the SEMP as an expression of current State policy. Whatever lingering effects the plan might have in other contexts, this outdated product of defunct legislation cannot now supersede zoning powers specifically granted a municipality by the Town Law, if indeed it ever could have done so. To require the ZBA to presently issue a variance because at one time there might have been a State mandate for the proposed conversion would be highly inappropriate now that the supposed directive has ex-

pired. This is especially so because the document purportedly expressing that mandate was itself subject to extensive modification every two years. Indeed, the folly of such an approach is indicated by the changing attitudes toward coal conversion seen within the various revisions of SEMP. Thus, although still endorsing the coal conversion project, the proposed draft of SEMP III (never adopted) recognized that the prospect for coal conversion had diminished since the publication of SEMP II: "Increased coal use for future electricity production has been significantly slowed by recent events. Electric utilities within New York State are reexamining plans for constructing and operating 2300 Mw of new coal fired electricity generation at sites which have been licensed by the New York State Board on Electric Generation Siting and the Environment" (Draft Report on New York State Energy Master Plan, at 127 [Aug. 1983]).

Moreover, O & R's reliance upon the State Energy Master Plan as a substitute for proving that conversion was necessary to provide safe and adequate service was misplaced even prior to the expiration of the SEMP. O & R viewed the SEMP as a controlling State directive which overrode the local zoning authority and mandated conversion of the Lovett units. We conclude, however, that the State Energy Master Plan was never intended to be given such conclusive effect.

Pertinent to this discussion are two related but independent principles which occasionally serve to limit or preclude municipal exercise of the zoning power. First, a locality may not use its zoning power to regulate when the Legislature has preempted that entire area of regulation (*Consolidated Edison Co. v Town of Red Hook,* 60 NY2d 99, 104-107; *see, People v New York Trap Rock Corp.,* 57 NY2d 371, 378; *People v Cook,* 34 NY2d 100, 109). Although such an intention to preempt may be either express or implied (*see, Consolidated Edison Co. v Town of Red Hook, supra,* at p 105; *People v De Jesus,* 54 NY2d 465, 469), it is not enough that the State enact legislation dealing with a certain issue. There must rather be a clear expression of intent "to exclude the possibility of varying local legislation" (*Monroe-Livingston Sanitary Landfill v Town of Caledonia,* 51 NY2d 679, 683, citing *People v Cook, supra,* at p 109).

In the instant appeals, O & R correctly concedes that the State has not preempted the area. There exists no clear expression of any State policy to preempt the already limited control localities have traditionally exercised over public utility plant modifications. The instant dispute presents a sharp contrast to those involving the power plant siting decision-making process, for

the latter has been preempted by legislation specifically derogating municipal authority to interfere with the construction of a power plant approved by the State Board on Electric Generation Siting and the Environment (*see,* Public Service Law art VIII; *Consolidated Edison Co. v Town of Red Hook, supra,* at pp 105-107). No similar regulatory scheme has been enacted with respect to coal conversion projects.

Application of a town zoning ordinance will also be limited if the ordinance is inconsistent with any general State law (*Consolidated Edison Co. v Town of Red Hook, supra,* at p 107; *see, People v De Jesus,* 54 NY2d 465, 468, *supra; McMillen v Browne,* 14 NY2d 326, 331), unless such divergence is authorized by a local law adopted pursuant to Municipal Home Rule Law § 10 (1) (ii) (d) (3). Thus, a municipality may not normally prohibit that which is permissible under State law (*see, Consolidated Edison Co. v Town of Red Hook, supra,* at p 108; *Wholesale Laundry Bd. of Trade v City of New York,* 12 NY2d 998, *affg* 18 AD2d 968, *on opn at* 17 AD2d 327). It is O & R's position that application of the Stony Point zoning ordinance to effectively prohibit the conversion project would be inconsistent with the Energy Law.

Energy Law § 3-105 (2) provides as follows: "[w]ithin one year of the effective date of this chapter, all municipalities shall review their charters, administrative rules and regulations, and practices and procedures to determine whether such are consistent with the energy policy of the state and shall effect or recommend such changes·as may be necessary to comply with the intent, purposes, programs and procedures set forth in or established pursuant to this chapter."

O & R contends that the SEMP expresses the energy policy of New York State, that the SEMP mandates conversion of the Lovett units, and that application of the zoning power to prohibit the conversion would thus be inconsistent with Energy Law § 3-105 (2). Whatever the validity of this line of analysis in the abstract, it has at least one factual flaw — the SEMP did not purport to "mandate" or "direct" the Lovett conversion project; rather, it simply found it to be in accord with the State's general energy aims. In *Matter of City of New York v Larocca* (97 AD2d 666), the Third Department, faced with a challenge to the adoption of SEMP II by the Energy Planning Board, stated that "[t]he Planning Board's statutory function is limited to adoption of an integrated document which addresses generic energy factors and recommends a comprehensive strategy to meet New York State's future energy needs * * * [I]n its limited role as a policy maker it lacks authority to approve or disapprove specific

sites." Hence, the court concluded (pp 666-667) that the inclusion of proposed new plants within the SEMP "was merely a recognition that those sites had already been sanctioned" by the appropriate agencies.

Although *Larocca* (*supra*) involved plant siting rather than plant modification, there is nothing within the plan itself or the legislation authorizing it to indicate that the Energy Planning Board was to have played a greater role in the realm of plant modification. Indeed, the drafter of SEMP II specifically recognized, albeit with displeasure, "the ability of municipal governments to use their local permitting powers to delay, impose unreasonable conditions on, or disapprove a coal conversion" and recommended the establishment of "a five member Coal Conversion Board within the Department of Environmental Conservation which would be authorized to override local ordinances found to be unreasonably restrictive" (1 New York State Energy Master Plan, at 38-39 [Mar. 1982]). Similarly, in adopting SEMP II, the Energy Planning Board recognized that municipalities do have the power to block power plant conversions in certain instances and strongly endorsed the proposed legislation (1 New York State Energy Master Plan, at 71). The proposal for a statute authorizing the overriding of the local ordinances was never enacted into law. For these reasons, we conclude that O & R was not entitled to the variance simply because the Lovett conversion project was included in the State Energy Master Plan, but rather was required to prove unnecessary hardship in accord with the standard set forth in *Matter of Consolidated Edison Co. v Hoffman* (43 NY2d 598, *supra*).

Our examination of the record persuades us that O & R did not meet its burden of proving that the modification was necessary for it to continue rendering safe and adequate service. This is a heavy burden and is not to be met simply by evidence, such as that submitted by O & R, that the proposed modification would allow the utility to render more economical service (1 Anderson, New York Zoning Law and Practice § 11.24, at 565 [3d ed]; *see, Matter of Long Is. Light. Co. v Incorporated Vil. of East Rockaway*, 279 App Div 926, *affd* 304 NY 932). The special treatment afforded power companies seeking variances is premised upon the unarguable truth that an adequate supply of electrical power is an absolute necessity in our society. Thus, if construction or modification of a power plant is necessary to ensure that supply of energy, the needs of the general public must prevail over the otherwise legitimate local concerns expressed in land use regulations.

Absent a statutory exemption from zoning regulations, however, this principle is limited to those situations in which strict adherence to zoning requirements might impair the utility's ability to safely provide an adequate supply of power (*see,* 6 Rohan, Zoning and Land Use Controls § 40.03 [1], at 40-73 — 40-75; 2 Anderson, American Law of Zoning § 12.31 [2d ed]). The courts of this State have not gone so far as to hold, as O & R would have us do, that a utility may disregard the zoning power of a municipality and obtain a use variance whenever the changes proposed by the utility would result in increased economy and efficiency and despite the absence of any viable claim that the modifications are necessary to provide an adequate supply of power. Although coal conversion might well result in significant savings for O & R's ratepayers, if indeed O & R's projections as to the relative costs of oil and coal in the future are at all accurate, the law as it presently exists requires that something more than an economic gain be shown in order to justifiably supersede a municipality's exercise of its legitimate zoning authority and require issuance of a use variance. For example, in *Matter of Consolidated Edison Co. v Hoffman* (43 NY2d 598, 608-609, *supra*) the utility showed that denial of the use variance it sought would have required it to cease operating the plant in question, thus adversely affecting its ability to provide power to its ratepayers. In the instant proceedings, O & R has never claimed that it cannot continue to utilize its present facilities at Lovett without modification, or that its oil burning generating units are inadequate to provide safe and adequate service. Having failed to show that conversion was necessary to provide safe and adequate service, O & R did not meet its burden of proving that strict compliance with the zoning ordinance would impose an unnecessary hardship upon it (*see, Matter of Consolidated Edison Co. v Hoffman, supra,* at p 611). Therefore, the denial of the variance application cannot be deemed arbitrary and capricious.

We emphasize that this is not a case in which a locality improperly refused to consider the energy needs of the larger area around it in considering a variance application. Rather, the ZBA had no occasion to do so because O & R, acting on the erroneous belief that it was not required to prove that conversion was necessary, made no attempt to provide such proof. The dilemma in which O & R finds itself, thwarted at the last moment by strict application of a municipal zoning ordinance after successfully maneuvering through the complex State permit process, illustrates the defects in a system which allows such overlapping and potentially contradictory sources of regulation.

If the system is to be altered, the task, of course, is for the Legislature. Until that body acts, however, absent proof of necessity, municipalities retain an enormous capacity to prevent power plant modifications that conflict with local zoning regulations. There is no basis, therefore, for the grant of the use variance sought by O & R.

## IV

Turning finally to the Town Board's administrative action relative to the development permit, our analysis must proceed on other grounds. As is discussed above, upon remittitur by Special Term due to the conflict of interest of the Town Board member who was also an O & R employee, O & R's application for the permit was denied by a 2-to-2 vote.

The Zoning Ordinance of the Town of Stony Point § 39-15.1 precludes issuance of a building permit for construction on any plot which is an acre or more in size unless the applicant first obtains a large scale development permit from the Town Board. Such a permit is to be issued if the Town Board approves the applicant's site plan. In reviewing the site plan, section 39-15.1 requires the Board to consider several enumerated factors, such as traffic, drainage, lighting, parking and screening or fencing. Of particular relevance to this dispute is section 39-15.1 (B) (3), which requires the Town Board to "give due consideration to": "(3) The availability of or provisions made for the treatment, removal or discharge of sewage or other effluent, whether liquid, solid, gaseous or otherwise, and the removal of garbage and other refuse created or generated by or as a result of the proposed use of the premises."

Because the resolution to approve O & R's application was rejected by a tie vote rather than by a majority of the Board and thus no resolution rejecting the proposal could be enacted, there exists and can exist no formal statement of reasons for the rejection. Under the circumstances, examination of the transcript of the Town Board meeting at which the vote was taken and the affidavits submitted in these proceedings by the two members who voted against the application provides a sufficient basis for determining whether the denial was arbitrary and capricious, especially since it was a legislative body that was involved (*see, Matter of Lemir Realty Corp. v Larkin*, 8 AD2d 970, *on remand* 195 NYS2d 232, *revd* 10 AD2d 1005, *affd* 11 NY2d 20).

So viewed, the record indicates that the two negative votes were based on a variety of considerations, the most significant of which we deem to be the tentative nature of O & R's plan for

disposal of the ash waste which would be produced by the plant following conversion. We conclude that this was a valid matter of concern for the Board and provides adequate support for denial of the permit.

O & R argues that the defeated resolution, if adopted, would have conditioned approval of the application upon subsequent approval of an appropriate disposal plan, and it has informed this court that it has since obtained DEC approval to utilize an adjacent quarry as a disposal site. Contending that the DEC decision bars the Town Board from considering any potential environmental impact, O & R postulates that the issue of ash waste disposal is now moot.

That the proposed resolution was conditioned on later approval of a disposal site does not render its defeat arbitrary and capricious, for it was certainly not unreasonable for the Board members to decide to deny the application while this question remained open rather than to approve it on condition that an acceptable disposal plan be developed at a later date. Nor does the DEC decision automatically authorize O & R to construct and operate the waste disposal facility, for that decision does not preclude the town from subsequently imposing higher or additional standards or regulations for waste disposal than those promulgated by the DEC, should it elect to do so. ECL 27-0711 specifically recognizes the continuing authority of a municipality to regulate waste disposal facilities, as long as such regulation is not inconsistent with the ECL or the regulations of the DEC. Moreover, the statute unambiguously declares that "[a]ny local laws, ordinances or regulations * * * which comply with at least the minimum applicable requirements set forth in any rule or regulation promulgated pursuant to this title shall be deemed consistent with this title or with any such rule or regulation".

Thus, a municipality may impose additional requirements upon solid waste disposal facilities and it is not required to allow construction of such a facility simply because it has been approved by the DEC (*Monroe-Livingston Sanitary Landfill v Town of Caledonia,* 51 NY2d 679, 683, *supra; see, Matter of Town of Poughkeepsie v Flacke,* 84 AD2d 1). DEC approval means that O & R's proposal satisfied the standards and regulations promulgated by the DEC, and to that extent it was binding upon the Town of Stony Point (*see, SCA Chem. Waste Servs. v Board of Appeals,* 52 NY2d 963, *affg* 75 AD2d 106). The town remains free, however, to impose additional standards and requirements or to prohibit the facility altogether, as long as its action is otherwise valid. Neither *Matter of Consolidated Edison*

*Co. v Hoffman* (43 NY2d 598, *supra*) nor *SCA Chem. Waste Servs. v Board of Appeals* (52 NY2d 963, *affg* 75 AD2d 106, *supra*) is to the contrary. In *Matter of Consolidated Edison Co. v Hoffman* (*supra*), the court held that the municipality could not reconsider environmental issues which had previously been decided by the Atomic Energy Commission, not the DEC, whereas the decision in *SCA Chem. Waste Servs. v Board of Appeals* (*supra*) was based upon an apparent *inconsistency* between a DEC decision concerning the effects of possible pipeline leakage and a contrary factual finding by a municipality. Here there is no such inconsistency. Thus, the unsettled question of ash waste disposal alone justified denial of the permit.

Nor was the decision of the Town Board to deny the permit invalid because of the failure to refer the matter to the Rockland County Planning Board. Although denominated a "permit", what was in essence involved here was a site plan approval process, as O & R itself contends. Prior to September 1, 1983, General Municipal Law § 239-m required reference to the County Planning Board only with respect to variances, special permits or the adoption or amendment of zoning ordinances. In 1983, the Legislature amended the statute to include the site plan approval process (L 1983, ch 324, § 1). Although it could be argued that site plan approval was previously included in the term "special permit", special permits, sometimes called special exceptions, traditionally refer to specific uses that can only be granted by town boards or boards of appeal. Site approvals and special permits have always been different land use devices (*see,* 1977 Atty Gen [Inf Opns] 200-201; 2 Rathkopf, Zoning and Planning § 30.04[1] [4th ed]; 3 Rathkopf, Zoning and Planning ch 41 [4th ed]). Furthermore, to hold they are the same would be to render the change in the law meaningless, and that we may not do (*see, Mabie v Fuller,* 255 NY 194). Since the instant proceedings took place prior to the effective date of the amendment, referral was not required, although it would now be necessary were we to nullify the determination of the Town Board and remit for further proceedings.

In sum, Special Term properly set aside on conflict of interest grounds the initial determinations granting the variances and the permit. The subsequent denial of the variance application was properly upheld, since O & R failed to prove its entitlement to a use variance, while the denial of the permit cannot be set aside because it was premised on valid considerations and was not arbitrary and capricious. The actions of the ZBA and the Town Board did not conflict with any general State law, nor did they trespass upon the realm of regulatory activities preempted

by the State. Hence, denial of the variance and permit applications must be sustained.

Accordingly, the judgments appealed from should be affirmed, with one bill of costs.

BRACKEN, WEINSTEIN and NIEHOFF, JJ., concur.

Two judgments of the Supreme Court, Rockland County, both dated June 14, 1983, as amended June 23, 1983, and two judgments of the same court, both dated March 5, 1984, affirmed, with one bill of costs.