**OMNIPOINT COMMUNICATIONS, INC., Plaintiff,**

**v.**

**The CITY OF WHITE PLAINS, The Planning Board of the City of White Plains, and Mary Cavallero, James Gould, J. Russell Imlay, John Garmet, Terrence Guerriere, Robert Stackpole and Juan Carlos Roskell in their capacities as members of the Planning Board of the City of White Plains, Defendants.**

No. 01 Civ. 3285(CM).

United States District Court, S.D. New York.

Dec. 4, 2001.

Robert I. Bodian, C. Anthony Mulrain, Lara M. Burnazian, Mintz Levin Cohn Ferris Glovsky and Popeo, PC, New York City, Joseph Maria, White Plains, New York.

## MEMORANDUM, DECISION AND ORDER

McMAHON, District Judge.

Omnipoint Communications, Inc. ("Omnipoint") brings this action against the City of White Plains and its Planning Board (the "Board"), alleging violations of the Federal Telecommunications Act of 1996, 47 U.S.C. § 332 (the "TCA"), Article 78 of The New York Civil Practice Laws and Rules, and 42 U.S.C. § 1983, for the Board's denial of Omnipoint's application for a permit to build a 150 foot monopole, with antennas and associated equipment, on certain premises owned by the Fenway Golf Club, located on Old Mamaroneck Avenue in the City.

Omnipoint alleges a violation of Section 704 of the TCA, 47 U.S.C. § 332(c)(7)(B)(iii), alleging that the Board's decision was not supported by substantial evidence (Count I); a violation of 47 U.S.C. § 332(c)(7)(B)(i)(I) for defendants' "unreasonable discrimination" against Omnipoint (Count II); a violation of 47 U.S .C. § 332(c)(7)(B)(i)(II) for defendants' "prohibit[ion] of the provision of personal wireless services" (Count III); a violation of 47 U.S.C. § 332(c)(7)(B)(ii) for defendants' unreasonable delay in its processing of Omnipoint's Application (Count IV); a violation of Civil Practice Laws and Rules Article 78 for the defendants' abuse of discretion in its denial of the Application (Count V); and, a violation of 42 U.S.C. § 1983 for defendants' violation of Omnipoint's rights, privileges, or immunities under the TCA (Count VI). Omnipoint sues for injunctive relief, declaratory relief, damages, costs and attorney's fees.

Omnipoint moves for partial summary judgment under Count I of its Complaint. Defendants cross-move for summary judgment to dismiss all six counts in Omnipoint's complaint.

For the reasons stated below, plaintiff's Motion for Partial Summary Judgment as to Count I is granted. Defendants' Motion for Summary Judgment as to Counts III, IV and V is granted. Defendants' Motion for Summary Judgment as to Count II is denied. Count VI is subsumed into Counts I and II.

## FACTS PERTINENT TO
## THE MOTION

### A. *Local Rule 56.1(d)*

Plaintiff has moved to strike defendant's Response to plaintiff's Rule 56.1 Statement of Facts and to deem defendants' unsupported general denials as admissions. Defendants failed to reply to plaintiff's motion to strike, and have supplied no explanation for this failure.

█ Local Rule 56.1(d) provides that "material facts set forth in the statement required to be served by the moving party will be deemed to be admitted unless controverted by the statement required to be served by opposing parties." In their response, defendants make general denials, and fail to, despite the voluminous record supplied by plaintiff in this matter, provide any record support or other basis for these denials. The Court is permitted to disregard such general denials when not supported by citations or if cited materials do not support factual assertions. *See Watt v. New York Botanical Garden,* Civ. No. 98–1095(BSJ), 2000 WL 193626, at *1 n. 1 (S.D.N.Y. Feb. 16, 2000); *see also Monahan v. New York City Dep't of Corrections,* 214 F.3d 275, 292 (2000) (noting that statements filed under Local Rule 56.1 by party opposing summary judgment must be accompanied by citation to admissible evidence).

In their Response, defendants generally denied 41 of plaintiff's 61 statements of fact. The rest are admitted. They provided no record support for these denials. Defendants' unsupported general denials are not only unhelpful, they are misleading. For instance, defendants denied ¶ 21 of plaintiff's 56.1 Statement, which states: "[S]ection 1.3 of the Ordinance, setting forth the purposes of the Ordinance specifically provides that one purpose of the Ordinance is '[t]o regulate and restrict the location of trades and industries in the location of 'buildings' designed for speci-

fied 'uses,' and for said purposes to divide the City into districts and to prescribe for each such district the trades and industry that shall be excluded or subjected to special regulation and the 'uses' for which 'buildings' may not be erected or altered.'" Plaintiff cited to the City of White Plains Zoning Ordinance located in the Record at pages 1262–63 (the "Zoning Ordinance"). Except for one small and inconsequential typographic error (sentence should read "*and* the location of 'buildings'," not "*in* the location of buildings"), Omnipoint accurately quotes the Zoning Ordinance.

Defendants submitted a counter-statement of facts in support of their cross-motion for summary judgment. It it, they affirmatively pled statements of fact they had previously denied. For example, ¶ 7 of plaintiff's Rule 56.1 Statement avers: "On or about June 1, 2000, Omnipoint submitted the Application to the Board. The Application was submitted in accordance with Section 2.4 (Definitions), Section 6.2.25 (Special Permit Uses), and as required by Section 5.2 (List of Use regulations), Section 6.4 (Review Procedures), Section 6.5 (Standards), and Section 6.7.12 (Public Utility Standards) of the Ordinance." In their Response, defendants denied this paragraph. Yet, ¶ 5 of defendants' Rule 56.1 statement repeats this language verbatim.

This District has adopted Local Rule 56.1(d) for a reason: to supply the Courts with an accurate factual record and to prohibit parties from taking the kind of misleading and unfair "shortcuts" (i.e., unsupported denials) as defendants have used here. I will, therefore, accept all of plaintiff's proposed facts as true for purposes of this motion. *See Watt,* Civ. No. 98–1095(BSJ), 2000 WL 193626, at *1 n. 1; *Monahan,* 214 F.3d at 292.

## B. *Pertinent Facts*

The following facts are taken from Plaintiff's Statement of Undisputed Material Facts made pursuant to Local Rule 56.1, such of Defendants' Statement of Undisputed Material Facts that are admitted by plaintiff, and the substantial record before the Court.

Omnipoint provides integrated wireless personal communication services ("PCS") through a national wireless network using PCS technology. [Pl. Facts, ¶ 1.] Omnipoint received a PCS wireless broadcast license from the Federal Communications Commission ("FCC") for several cities, including the New York Metropolitan area. White Plains is part of this area.

The defendant Planning Board is an agency of the City of White Plains, and the individually named defendants are all members of this Board, having been appointed by the Mayor of White Plains. [Def. Facts, ¶ 3.] The Board has the delegated authority to grant applications for special permits and site development approval under the City of White Plains Zoning Ordinance (the "Zoning Ordinance").

Based upon Omnipoint's research and analysis, and as part of an extensive site review, Omnipoint determined that a 150 foot unmanned telecommunications monopole, with associated equipment (the "Facility") was needed in order to fill a gap in its coverage in the City of White Plains. [Pl. Facts, ¶¶ 1 & 2.] The proposed type of monopole is designed to look like a tree, and the antennas on such a monopole are "hidden" or camouflaged. [Pl. Facts, ¶ 3.] At some point in 2000, Omnipoint entered into an agreement with Fenway Golf Club to lease space for the Facility.

### 1. *The Application and Hearing Process*

On or about June 1, 2000, Omnipoint submitted its Application to the Board requesting a special permit and any and all other necessary permits to construct the Facility. This Application complied with all of the requirements set out in the Zoning Ordinance. [Pl. Facts, ¶ 7.] Section 4.4.15.2 exempts Omnipoint's 150 foot monopole from the height limitations contained in the Ordinance. [Pl. Facts, ¶ 8.] As part of its Application, Omnipoint provided visual simulations of the proposed structure from various viewpoints. [Pl. Facts, ¶ 5.] Omnipoint presented evidence that the surrounding residential neighborhood is buffered by a mature and deciduous tree line. *Id.* It asserted that this natural buffer combined with the camouflaged monopole would mitigate the visual impact of the Facility to the greatest extent possible. *Id.* It showed that the greatest visual impact would be on the Fenway Golf Course itself, the lessor of the property. *Id.*

The Board held public hearings on the Application on July 11, 2000, September 12, 2000, October 10, 2000, November 14, 2000, December 19, 2000, January 16, 2001, February 13, 2001 and March 20, 2001. During the course of these hearings, extensive evidence, through both submitted reports and oral testimony, was presented to the Board on behalf of both Omnipoint and those residents opposed to the construction of the Facility.

### (a) Gap in coverage evidencing a "public necessity"

Section 6.7.12.1 of the Zoning Ordinance requires a finding that a "public necessity" exists for the erection of the Facility. In its Application, Omnipoint submitted an engineering report written by Richard A. Conroy a senior Radio Frequency Engineer at Omnipoint. The Report explained, with the aid of maps and charts, that there was a gap in Omnipoint's coverage in the White Plains area. It analyzed the possible construction of monopoles at various sites in the community, and determined

whether a monopole at a particular site would close the coverage gap. The report concluded that a facility located at the Golf Course "is necessary to provide coverage [necessary to close the gap] as well as overlap with existing and planned sites." [Pl. Facts, ¶ 27.] The report stated that a tower on any of the other sites examined would fail to close the gap.

Pursuant to the Board's request at the July 11, 2000 hearing, Omnipoint also submitted an Addendum to this report, dated July 20, 2000, describing six alternative installation scenarios with maps showing the coverage provided at each alternative location and combination of these locations, and finding that coverage lacking.

Chris Olson, a Radio Frequency Engineering Consultant for Omnipoint responsible for Omnipoint's radio frequency design in New York, testified at various hearings that he was familiar with the Zoning Ordinance, the existing Facilities in White Plains, and the proposed Facility at the Golf Course. Mr. Olson testified to the existence of a gap in Omnipoint's coverage which needed to be filled by a new monopole facility. He also testified that the 150 foot tall proposed Facility on the Golf Course would fill this gap in Omnipoint's coverage. At the Board's suggestion, Olson tested additional sites, and combinations of sites as alternative locations of an antenna facility. Of the sites that Omnipoint could possibly lease, Olson found that only two "combination" scenarios would close the coverage gap, and none of the individual sites would close the gap. Omnipoint's project planner later determined that the "combination" scenarios would have a greater visual impact upon the community, and they were rejected as viable sites.

The evidence submitted by Omnipoint to demonstrate a significant gap in coverage and the necessity of the Facility to close such a gap included detailed analyses submitted by licensed radio frequency engineers. It was never rebutted by another radio frequency engineer. [Pl. Facts, ¶ 29.] The Board, however, rejected the evidence presented by Omnipoint. *Id.* Instead, based on testimony and letters from the public stating that cellular telephones serviced by other providers currently operated in the vicinity, the Board determined that no public necessity existed because other wireless providers were able to serve the "gap" area. *Id.* Nothing in the language of the Ordinance provides any requirement that there be no other provider in the area. [Pl. Facts, ¶ 30.] In previous Board decisions granting permits to similar monopole installations, the Board analysis related only to whether the applicant had demonstrated a gap in its service. *See* White Plains Planning Board Resolution approving SMSA Ltd. Partnership's Special Permit Use application for a Public Utility Structure consisting of a Cellular Radio Facility to be located on Old Road to Kensico, dated February 15, 1995, p. 7; White Plains Planning Board Resolution approving SMSA Ltd. Partnership's Special Permit Use application for a Cellular Facility/Public Utility to be located on North Street, dated June 10, 1998, p. 3, found at Mulrain Aff., Exhs. A & B; Pl. Facts, ¶ 33 [hereinafter "Kensico Road Decision" and "North Street Decision"].

(b) Visual/aesthetic impact

Prior to submitting its Application, Omnipoint engaged a professional planner, Donna Marie Stipo, to perform an evaluation of the aesthetic impact associated with installing the Facility on the Golf Course. [Pl. Facts, ¶ 39.] Stipo is the President of DMS Consulting Services, Inc. and a member of the American Planning Association. She is responsible for project planning for Omnipoint in Westchester, Rockland, Orange, Putnam, Nassau, Suffolk, Ulster and Duchess Counties.

As Stipo testified before the Board, to evaluate the aesthetic impact associated with the Facility, Stipo conducted a crane test which involved raising a crane the height of 150 feet. [Pl. Facts, ¶ 39.] With the crane mast lifted to 150 feet, Stipo traveled to each street within a one-mile radius of the Golf Course to determine the area from which the Facility would be visible. *Id.* In any instance where Stipo observed the crane, she then used a 50 mm camera to photograph it. Thereafter, Stipo utilized computer software to insert into her photographs a simulation of the Facility in the precise location and at the exact height that the crane and its mast were located. *Id.*

Stipo concluded that the greatest impact on the Facility would be to the Golf Course itself. self [Pl. Facts, ¶ 40.] In addition, Stipo testified that "Soundview is the closest or nearest residential roadway and that roadway was driven ... numerous times to make sure that [Stipo] would be able to spot the crane." *Id.* Based on Stipo's analysis and photo simulations, Stipo testified that "the crane is located or has a view with respect to one property and the property would be the closest home ... 258 Soundview Avenue." *Id.* 258 Soundview Avenue is situated approximately 350 feet "from the edge' of the Facility's compound." *Id.* Stipo further testified that the neighboring Temple Kol Ami "would not have a view of the structure [because] they have a heavily wooded area that provides a natural buffer." [Pl. Facts, ¶ 41.] According to the City's own tree height analysis, "[t]he trees to the north, between the proposed tower and the residences on Soundview Avenue and Kol Ami appear to be in good health and range in height from 80 to 100 feet." [Pl. Facts, ¶ 42.] Stipo testified that only four feet of the Facility would be visible at a 70–foot tree line. *Id.*

At the conclusion of the July 11 hearing, the Board requested that Omnipoint evaluate the feasibility of locating the proposed Facility on eight alternative sites, or on a combination of these alternative sites. [Pl. Facts, ¶ 43.] Omnipoint's engineer determined that only two of the proposed alternative sites would enable Omnipoint to adequately fill its coverage gap. *Id.* These two site scenarios involved the construction of several Facilities on a group of the alternative sites. Stipo made a visual impact analysis of these two scenarios and submitted her findings to the Board in a Supplemental Planning Analysis. Stipo concluded that both of these scenarios would have a more intrusive impact to the community than the proposed Facility at the Golf Course. *Id.*

During the course of these hearings, Stipo performed a visual impact analysis of the Facility at a different location on the Golf Course, at a point 40 feet further away from the nearest public street. She positioned a crane at that point on the Golf Course and performed the same analysis as she did for the proposed site. In her professional opinion, she found this location would be more visible to residents. Stipo concluded that from her crane tests, visual observations, and logistical planning reports, Omnipoint's proposed location for the monopole would have a minimal visual or aesthetic impact on the community, and would only be seen by those on the golf course and by one neighboring house.

The Board chose largely to disregard Stipo's photo simulations. [Pl. Facts, ¶ 46.] Because the Board did not attend the crane testing, it rejected Stipo's testimony, ruling that the failure to have Board members attend was in and of itself sufficient to support "an inference that visual impact analysis testing demonstrated that no measure could mitigate the visual impact of the proposed monopole." *Id.;* Decision, p. 23; Pl. Facts, ¶ 49.

The Ordinance contains no provision requiring or suggesting that an applicant conduct crane testing or other visual impact analysis. [Pl. Facts, ¶ 50.] Moreover, the Ordinance contains no requirement that if an applicant decides to conduct such visual impact analysis, that the Board must be notified, that the public be notified, or that the Board participate. *Id.*

Another basis for the Board's Decision to deny Omnipoint's Application was its finding that "[p]hoto simulations provided by the Applicant are not very useful in the review of the project because they do not demonstrate the full visual impact of the tower, (*i.e.,* views from the second story windows, backyards and different angles.)" [Pl. Facts, ¶ 53.] The Ordinance does not require any photo simulations or that such photo resolutions be taken from second story windows in resident homes, backyards of private property and at different angles. *Id.* At no point did the Board request that Omnipoint provide photo simulations from these locations. *Id.* In the previous applications relating to monopoles that the Board reviewed, the Board had accepted photo simulations similar to those submitted by Omnipoint, and had based favorable decisions on these photos. In those instances, the Board found that the photo simulations constituted substantial evidence. [Pl. Facts, ¶ 55.]

Those residents opposed to the Application submitted a visual impact study conducted by Charles P. May and Associates, P.C., dated November 14, 2000. [Pl. Facts, ¶ 56; Def. Facts, ¶ 14.] May provided an "engineering cross-section" which purported to provide "what the scale of the actual tower would be in relationship to a home or actually a car or anything along those lines." *Id.* In support of this analy-

sis, May also provided certain rudimentary diagrams. *Id.* As Omnipoint pointed out, May's submission, among other things, disregarded the actual topography of the area, the existing trees and the existing structures. [Pl. Facts, ¶ 57.]

In response to May's submission, Omnipoint provided additional expert testimony. *Id.* Omnipoint also provided a supplemental planning analysis to the Board. Omnipoint submitted an aerial photograph of the area prepared by the Westchester County Department of Planning which demonstrated the proposed structure in relation to the actual wooded tree line. *Id.* Additionally, Omnipoint witness Neil Wilson testified that May's study was flawed in that May "was raising a specific visual project using very general information." [Pl. Facts, ¶ 58.] Wilson charged that May's analysis is based on a "very flat plane, a desert like surface for apt description." *Id.* Wilson presented a corrected graph analysis, which included information publicly available regarding this area. [Pl. Facts, ¶ 59.]

The Board gave a considerable amount of weight to letters and testimony from nearby residents opining about the negative aesthetic impact of the proposed Facility. The Board also considered the testimony and numerous communications it received from the congregants of the Kol Ami Temple. The Temple's land abuts the Golf Course. These congregants expressed their concerns that the monopole would detrimentally effect their ability to worship at the Temple, especially in the glass-walled Schulman Chapel, known as the Chapel in the Woods.[1]

(c) Property Values

In response to concerns voiced regarding the potential adverse effects on proper-

---

1. I have already concluded that any argument based on "religious use" has no merit as a matter of law. *See Omnipoint Communica-* *tions, Inc. v. City of White Plains (Matter of Kol Ami),* 202 F.R.D. 402 (S.D.N.Y.2001).

ty values resulting from the erection of the Facility, Omnipoint provided the Board with a detailed appraisal report by Lane Appraisals, Inc., dated October 27, 2000. [Pl. Facts, ¶ 34.] The appraiser who submitted the report inspected the Golf Course site and investigated the sales of over eighty properties sold after a cell tower was erected in their vicinity. [Pl. Facts, ¶ 35.] The report concluded that the Facility would not result in a diminution of the real estate values of nearby properties. [Pl. Facts, ¶ 36.] Lane Appraisals submitted an updated report to the Board in January 2001, also based on an analysis of actual home sales and concluded again that there was "no diminution of value to homes close to cell phone towers." [Pl. Facts, ¶ 37.]

Despite the detailed report submitted by Lane Appraisals, the Board found the evidence submitted by those opposed to Omnipoint's Application to be weightier. [Pl. Facts, ¶ 37.] This evidence consisted of a letter from an individual at an appraisal company and a letter from a realtor. *Id.* The letter from the appraisal company states his opinion that the creation of the monopole would have a significant detrimental affect on property value. This letter does not indicate, or even suggest, that its author visited the Golf Course site, was familiar with the Facility, analyzed home sales to support his opinion, or adhered to the requirements or guidelines of any professional association. *Id.* The realtor's letter is also conclusory, and opines that the Facility would constitute an "eyesore" which would lower selling prices of surrounding properties. *Id.* As with the appraiser's letter, no support was offered for the realtor's conclusions. *Id.*

### 2. *The Decision*

At the conclusion of the January 16, 2001 hearing, the Board closed the public hearing and advised Omnipoint that it intended to deny its Application. [Def.

Facts, ¶ 8.] At the March 20, 2001 hearing, the Board denied the Application and issued a written resolution (the "Decision"). [Def. Facts, ¶ 9.]

In its Decision, The Board relied on Sections 1.2, 1.3, 1.5, 1.6 and 1.11 [Purposes], Sections 6.5.1 and 6.5.2 [Standards for Special Permit Uses], and Sections 6.7.12.1 and 6.7.12.3 [Specific Standards for Public Utility Structures] of the Zoning Ordinance. The Board denied Omnipoint's Application for a special permit and site development approval. The Board ultimately rejected Omnipoint's expert testimony and reports, visual impact analysis testing and photo simulations. [Def. Facts, ¶ 12.] The Board did accept the evidence submitted by those residents opposed to the Application. The Board denied Omnipoint's Application based on its " 'Findings of Fact' and findings regarding the conformity of the Application to the Zoning Ordinance and the standards for review of the aesthetic impact of telecommunications installations established by the Planning Board in previous applications for similar installations." [Decision, p. 25.] Specifically, the Board found the there was substantial evidence that the Facility would have an adverse visual impact on the community, that property values would decline if the Facility were to be erected, and that Omnipoint had failed to establish that there was a gap in coverage that would create a "public necessity" for the Facility. [Decision, pp. 21–25.]

### 3. *The Current Proceeding*

Omnipoint timely commenced this action on April 19, 2001. Omnipoint moves for partial summary judgment on its first count against defendants, violation of 47 U.S.C. § 332(c)(7)(B)(iii). Omnipoint alleges that defendants are in violation of 47 U.S.C. § 332(c)(7)(B)(iii) because the Board's Decision was not supported by

substantial evidence. Omnipoint claims that the Board wrongly disregarded or gave improper weight to the many studies and reports it submitted, and to the testimony its experts gave, namely those by the radio frequency engineers, the reports, photos and testimony of Donna Marie Stipo, and the detailed appraisal of homes in areas where cell phone towers were built, compiled by Lane Appraisals. Omnipoint argues that the Board's reliance on the non-expert testimony of residents and Kol Ami congregants, the unsupported opinions of a local realtor and an appraisal company, and a faulted visual impact analysis was improper because these submissions did not constitute "substantial evidence" in light of the totality of the evidence submitted.

Defendants cross-move for summary judgment on Omnipoint's entire complaint. Defendants argue that they acted in accordance with both State and Federal law at all times, and rendered a decision which is within that substantial evidence standard of the TCA.

## DISCUSSION

### I. *Mootness*

▮▮▮ Defendants argue that this action is now moot because, on October 19, 2001, the Fenway Golf Club terminated the Revocable Agreement[2] between itself and Omnipoint, on the ground that Omnipoint had not obtained "by the end of the Option Period (as defined in the Revocable Agreement) all appropriate White Plains governmental approvals authorizing its construction and use of the PCS and associated

2. The Revocable Agreement is not in the Record, so the Court can not comment on its terms.

3. Omnipoint has orally represented to the Court that it is engaged in discussions with Fenway concerning a new lease option. Fenway denies that any said discussions are taking place. [Citron Aff., p. 2.] Putting to one

antenna." *See* Citron Aff., Exh. A. It does appear that the agreement has expired.[3] Although the termination of the agreement does make the award of injunctive and declaratory relief moot, it does not moot the case.

In its Complaint, Omnipoint sued for damages for violation of the TCA and § 1983, and for costs and attorneys fees, in addition to its claims for injunctive and declaratory relief. "The availability of damages or other monetary relief almost always avoids mootness." *See* Wright, Miller & Cooper, Federal Practice and Procedure: Jurisdiction 2d § 3533.3, at p. 261 (1984 & 2001 Supp.). Even if the "amount at issue is undeniably minute ... as long as the parties have a concrete interest, however small, in the outcome of the litigation, the case is not moot." *Ellis v. Brotherhood of Railway, Airline and Steamship Clerks, Freight Handlers, Express and Station Employees,* 466 U.S. 435, 442, 104 S.Ct. 1883, 1889, 80 L.Ed.2d 428 (1984). *See also Ellis v. Blum,* 643 F.2d 68, 82–83 (2d Cir.1981) (finding that although plaintiff's claim was mooted on her claims for injunctive and declaratory relief, a live damages claim for $1500 "save[d] the action from the bar of mootness").

Here, Omnipoint has alleged that defendants' violations of law caused it to suffer money damages. If White Plains did indeed violate the TCA and § 1983, the very issue that moots the claims for declaratory and injunctive relief—failure to issue the necessary special permits—gives rise to

side the issue of whether Omnipoint and this Court were misled by White Plains (with perhaps a behind-the-scenes boost from Fenway) into adjourning the adjudication of this motion pending a settlement that never happened, the pendency of negotiations—or lack of same—turns out to have no bearing on the question of mootness.

damages for such items as lost revenue due to coverage gaps and costs incurred in the fruitless effort to build the monopole. The amount of said damages may be significant.[4]

Of course, if plaintiff cannot collect damages under either the TCA or § 1983 as a matter of law, it cannot avoid having the complaint dismissed as moot. I conclude, however, that § 1983 affords plaintiff relief, in the form of damages, for any violations of the TCA committed by defendants.

Omnipoint asserts that defendants violated 42 U.S.C. § 1983 by violating its federal rights under the TCA. In response, defendants argue that a violation of the TCA does not support a § 1983 claim.

The Second Circuit has never decided whether a violation of the TCA can support § 1983 claim. Indeed, no court of appeals has addressed this issue.[5] Several district courts in the Second Circuit, however, have affirmatively held that § 1983 relief is available for violations of the TCA. *See Sprint Spectrum, L.P. v. Mills,* 65 F.Supp.2d 161, 162 (S.D.N.Y.1999); *see also SBA Communications, Inc. v. Zoning Comm'n of the Town of Franklin,* 164 F.Supp.2d 280, 294–95 (D.Conn.2001); *SBA Comm., Inc. v. Brookfield,* 96 F.Supp.2d 139, 142 (D.Conn.2000); *Omnipoint Comm. v. Wallingford,* 91 F.Supp.2d 497 (D.Conn.2000); *Cellco Partnership v. Farmington,* 3 F.Supp.2d 178 (D.Conn. 1998); *Smart SMR of New York, Inc. v. Zoning Comm'n of the Town of Stratford,* 995 F.Supp. 52, 60–61 (D.Conn.1998). I concur with their reasoning.

Section 1983 may be employed to remedy violations of federal statutes. *See*

Maine v. Thiboutot, 448 U.S. 1, 4, 100 S.Ct. 2502, 65 L.Ed.2d 555 (1980). Section 1983 remedies are not available in actions for violations of all federal statutes, however. In order to state a claim under § 1983, Omnipoint must meet two requirements. First, the federal statute must create private rights enforceable under § 1983; second, the statute must not evidence congressional intent to foreclose a cause of action under § 1983. *See Blessing v.. Freestone,* 520 U.S. 329, 117 S.Ct. 1353, 137 L.Ed.2d 569 (1997).

*Blessing* controls whether the TCA gives rise to a federal right. This Court must consider whether (1) Congress intended the statutory provision to benefit the plaintiff; (2) the right allegedly protected by the TCA is not so "vague and amorphous" that its enforcement would strain judicial competence; and (3) the TCA clearly imposes a binding obligation on the states. *Town of Franklin,* 164 F.Supp.2d at 295 (citing *Blessing,* 520 U.S. at 329, 117 S.Ct. 1353).

I must first decide whether Congress intended that the TCA benefit the plaintiff. *Blessing,* 520 U.S. at 340, 117 S.Ct. 1353. The TCA allows "any person adversely affected by any final action or failure to act by a State or local government or any instrumentality thereof that is inconsistent with this subparagraph" to "commence an action in any court of competent jurisdiction." 47 U.S.C. § 332(c)(7)(B)(v). According to the plain meaning of the statute, Omnipoint, as the recipient of an improperly decided denial, is an intended beneficiary of the TCA.

4. Plaintiff purports to sue for damages under both the TCA and § 1983. No Court has ever concluded that damages are available under the TCA itself.

5. The Eleventh Circuit did address this issue in *AT&T Wireless PCS, Inc. v. City of Atlanta,*

210 F.3d 1322 (11th Cir.2000). A panel of that Court held that violations of the TCA do support a § 1983 claim. *Id.* This decision, however, was recently vacated in anticipation of an *en banc* rehearing. *AT&T Wireless PCS, Inc. v. City of Atlanta,* 260 F.3d 1320 (11th Cir.2001).

Next, I must consider whether "the right assertedly protected by the statute is not so 'vague and amorphous' that its enforcement would strain judicial competence." *Blessing*, 520 U.S. at 340, 117 S.Ct. 1353. The plain language of the TCA vests enforcement with the judiciary. 47 U.S.C. § 332(c)(7)(B)(v). Congress itself believed that the rights protected by the TCA should be protected by the courts. I find that enforcement of the TCA would not strain judicial competence.

Finally, I must decide whether the TCA "unambiguously impose[s] a binding obligation." *Blessing*, 520 U.S. at 341, 117 S.Ct. 1353. The TCA uses the term "shall," which is a mandatory term. *See* 47 U.S.C. § 332(c)(7)(B)(i)–(iii). Accordingly, the TCA imposes binding obligations on state and local government. The TCA satisfies the three prongs described in *Blessing*. Accordingly, I find that plaintiffs are enforcing a federal right under the TCA.

Once a statute is found to create a federal right, "there is [ ] a rebuttable presumption that the right is enforceable under § 1983." *Blessing*, 520 U.S. at 341, 117 S.Ct. 1353. This presumption will be rebutted if Congress explicitly or implicitly foreclosed a remedy under § 1983. *Id.* Congress did not explicitly foreclose § 1983 remedies. To the contrary, Congress explicitly endorsed alternative remedies under the TCA. A provision of the TCA provides: "This Act and the amendments made by this Act shall not be construed to modify, impair, or supersede Federal, state, or local law unless expressly provided in such Act or amendments." Pub.L. No. 104–104, § 601(c)(1), 110 Stat. 143 (1996) (reprinted in 47 U.S.C. § 152, historical and statutory notes). The presumption that Omnipoint's federal right

under the TCA is not foreclosed by Congress is not rebutted. Section 1983 remedies are viable under the TCA.

Because Counts I, II, III and IV seek damages under § 1983 for defendants' alleged violations of the TCA, these claims are not moot. Count V, however, alleges a violation of Civil Practice Laws and Rules (Article 78). Damages may not be awarded under Article 78. Accordingly, Count V is dismissed as moot.[6]

## II. *Governing Law*

### A. The City of White Plains Zoning Ordinance

The Zoning Ordinance applies to many types of structures within the city of White Plains, from swimming pools to hotels to fast food restaurants. A PCS monopole is considered a public utility. Sections 5.1, 6.5, 6.7.12 of the Zoning Ordinance set forth the criteria for the construction of a public utility structure in the R1–30 zoning district in which the Golf Course resides. The Board purportedly denied Omnipoint's Application on the basis of particular sections of the Zoning Ordinance.

Section 1 lists the overarching "Purposes" of the Zoning Ordinance. The Board relied on several of these purposes in its denial of Omnipoint's Application. They are excerpted as follows:

1.2 ... these regulations are designed to promote ... the most desirable "use" for which the land of each district may be adapted and are intended to conserve the value of "buildings" and enhance the value of land throughout the City.

1.3 These regulations are designed to promote the public health, safety and general welfare and are made

---

**6.** Count VI simply seeks damages pursuant to § 1983. It does not purport to state any independent factual ground or legal basis for

relief. It is the basis for damages. It is, therefore, subsumed in the other claims for relief.

with reasonable consideration, among other things, to the character of the district, its peculiar suitability for particular "uses," the conservation of property values and the direction of building development, in accord with a well considered plan.

1.5 To protect the character and the social and economic stability, and to encourage the orderly and beneficial development of the City and all of its neighborhoods.

1.6 To ... minimize conflicts among the "uses" of land.

1.8 To provide a guide for public policy and action in the efficient provision of public facilities and services, and for private enterprise in building development, investment, and other economic activity relating to "uses" of land throughout the City.

1.11 To preserve the natural beauty of the City; to protect the City against unsightly, obtrusive, and obnoxious land "uses" and operations; to enhance the aesthetic aspect of the natural and manmade elements of the City; and to ensure appropriate development with regard to those elements.

Section 6.5 of the Zoning Ordinance provides general standards with which all special permit uses must comply. The relevant provisions are as follows:

6.5.1 The location and size of the special permit "use," the nature and intensity of the operations involved in or conducted in connection with it, the size of the site in relation to it and the location of the site with respect to "streets" giving access to it are such that it will be in harmony with the appropriate and orderly development of the area in which it is located.

6.5.2 The location, nature and "height" of "buildings," walls, fences and the nature and extent of the existing or proposed plantings on the site are such that the special permit "use" will not hinder or discourage the appropriate development and 'use' of adjacent land and "buildings."

Section 6.7.12 establishes specific standards for "public utility" "structures," such as the proposed monopole. They are as follows:

6.7.12.1 When proposed in a residential district, "public utility" "buildings" or "structures" shall be subject to a finding, in addition to the standards of Section 6.5, that a public necessity exists for such "use," and that "use" of the particular site for which application is made is necessary from the public standpoint.

6.7.12.2 The approving agency may require that such "use" be enclosed by protective fencing with a gate which shall be closed and locked except when necessary to obtain access thereto.

6.7.12.3 The installation shall be so designed and enclosed, painted and screened with evergreens that it will be harmonious with the area in which it is located. The entire property shall be suitably landscaped and maintained in reasonable conformity with the standards of property maintenance of the surrounding neighborhood.

B. Federal Telecommunications Act of 1996

In the TCA, the Federal Government imposes limitations on the "regulation of

the placement, construction, and modification of personal wireless service facilities by any State or local government or instrumentality thereof." 47 U.S.C. § 332(c)(7). The TCA was intended "to provide for a pro-competitive, de-regulatory national policy framework designed to accelerate rapidly private sector deployment of advanced telecommunications and information technologies and services ... by opening all telecommunications markets to competition...." *Cellular Telephone Co. v. Town of Oyster Bay,* 166 F.3d 490, 493 (2d Cir.1999) (quoting a TCA Conference Committee report found at H.R.Conf. Rep. No. 104–458, at 206 (1996), reprinted in 1996 U.S.C.C.A.N. 124, 124). In furtherance of this goal, Congress added 47 U.S.C. § 332(c) to the act. *Id.* That section provides:

(7) Preservation of local zoning authority

(A) General Authority

Except as provided in this paragraph, nothing in this chapter shall limit or affect the authority of a State or local government or instrumentality thereof over decisions regarding the placement, construction, and modification of personal wireless service facilities.

(B) Limitations

(i) The regulation of the placement, construction, and modification of personal wireless service facilities by any State or local government or instrumentality thereof—

(I) shall not unreasonably discriminate among providers of functionally equivalent services; and

(II) shall not prohibit or have the effect of prohibiting the provision of personal wireless services.

(ii) A State or local government or instrumentality thereof shall act on any request for authorization to place, construct, or modify personal wireless service facilities within a reasonable period of time after the request is duly filed with such government or instrumentality, taking into account the nature and scope of such request. '

(iii) Any decision by a State or local government or instrumentality thereof to deny a request to place, construct, or modify personal wireless service facilities shall be in writing and supported by substantial evidence contained in a written record.

(iv) No State or local government or instrumentality thereof may regulate the placement, construction, and modification of personal wireless service facilities on the basis of the environmental effects of radio frequency emissions to the extent that such facilities comply with the Commission's regulations concerning such emissions.

(v) Any person adversely affected by any final action or failure to act by a State or local government or any instrumentality thereof that is inconsistent with this subparagraph may, within 30 days after such action or failure to act, commence an action in any court of competent jurisdiction. The court shall hear and decide such action on an expedited basis. Any person adversely affected by an act or failure to act by a State or local government or any instrumentality thereof that is inconsistent with clause (iv) may petition the Commission for relief.

Traditionally, federal courts are extremely deferential in reviewing local zoning decisions. *See e.g., Schad v. Borough of Mount Ephraim,* 452 U.S. 61, 68, 101 S.Ct. 2176, 68 L.Ed.2d 671 (1981). Although Congress has preserved local zoning authority over the siting of wireless facilities under § 332(c)(7)(A), the method by which siting decisions are made is subject to judicial oversight under § 332(c)(7)(B). "Therefore, denials sub-

ject to the TCA are reviewed by this court more closely than standard local zoning decisions." *Town of Oyster Bay,* 166 F.3d at 493.

## III. *Summary Judgment Standard*

Plaintiff moves for partial summary judgment and defendants cross-move for summary judgment dismissing the complaint. The standard of review is the same for both on the issue of liability. Under Rule 56(c) of the Federal Rules of Civil Procedure, the Court will grant summary judgment if the record shows that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law. *See Celotex Corp. v. Catrett,* 477 U.S. 317, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). The Court views the record in the light most favorable to the non-movant and resolves all ambiguities and draws all reasonable inferences against the movant. *See United States v. Diebold, Inc.,* 369 U.S. 654, 655, 82 S.Ct. 993, 8 L.Ed.2d 176 (1962); *Donahue v. Windsor Locks Bd. of Fire Commn'rs,* 834 F.2d 54, 57 (2d Cir.1987).

An issue of fact is "genuine" if it provides a basis for "a rational trier of fact to find for the nonmoving party." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 587, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986). The mere existence of disputed factual issues is not enough to defeat a motion for summary judgment. *See Knight v. United States Fire Ins. Co.,* 804 F.2d 9, 11 (2d Cir.1986), *cert. denied,* 480 U.S. 932, 107 S.Ct. 1570, 94 L.Ed.2d 762 (1987). The moving party bears the initial burden of demonstrating the absence of any genuine issue of material fact. *See Consarc Corp. v. Marine Midland Bank, N.A.,* 996 F.2d 568 (2d Cir.1993) (citing *Adickes v. S.H. Kress & Co.,* 398 U.S. 144, 157, 90 S.Ct. 1598, 26 L.Ed.2d 142 (1970)). This burden may be met by demonstrating that there is a lack of evidence to support the nonmoving party's

claim. *See Celotex Corp.,* 477 U.S. at 325, 106 S.Ct. 2548. Once the moving party satisfies this initial burden, the nonmoving party must set forth "specific facts showing that there is a genuine issue for a trial." Fed.R.Civ.P. 56(e).

## IV. *Substantial Evidence (Count I)*

### A. Substantial Evidence Standard

The TCA established procedural requirements that local planning boards must comply with in their evaluation of cell site applications. *Town of Oyster Bay,* 166 F.3d at 494. The TCA requires that denials of permits to build wireless service facilities be supported by substantial evidence. 47 U.S.C. § 332(c)(7)(B)(iii). This Court should apply "the traditional standard used for judicial review of agency actions" in its determination of whether the denial was supported by substantial evidence. *Town of Oyster Bay,* 166 F.3d at 494 (quoting H.R.Conf.Rep. No. 104–458, at 206 (1996), *reprinted in* 1996 U.S.C.C.A.N. 124, 223). The Court may neither engage in its own fact-finding nor supplant the Board's reasonable determinations. *Id.* (citing *PrimeCo Personal Communications, L.P. v. Village of Fox Lake,* 26 F.Supp.2d 1052, 1063 (N.D.Ill. 1998)).

Although it is true that a district court generally defers to a zoning board's decision by not substituting its judgment for that of the Board, "it must overturn the board's decision under the substantial evidence test if it 'cannot conscientiously find that the evidence supporting the decision is substantial, when viewed in the light that the record in its entirety furnishes, including the body of evidence opposed to the Board's view.'" *SBA Communications, Inc. v. Zoning Comm'n of the Town of Brookfield,* 112 F.Supp.2d 233, 237 (D.Conn.2000) (*quoting BellSouth Mobility, Inc. v. Gwinnett County,* 944 F.Supp.

923, 928 (N.D.Ga.1996)); *see also Town of Oyster Bay,* 166 F.3d at 494. Substantial evidence has been construed to mean less than a preponderance, but more than a scintilla of evidence. "It means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Universal Camera v. NLRB,* 340 U.S. 474, 477, 71 S.Ct. 456, 95 L.Ed. 456 (1951) (internal quotations omitted). The record should be viewed in its entirety; that is, evidence opposed to the Town's view must be considered as well. *American Textile Mfr. Inst., Inc. v. Donovan,* 452 U.S. 490, 523, 101 S.Ct. 2478, 69 L.Ed.2d 185 (1981). Local and state zoning laws govern the weight to be given the evidence. *Town of Oyster Bay,* 166 F.3d at 494.

B. Grounds for Denial

(1) Wrongful reliance on the "Purposes" of the Zoning Ordinance

■ Plaintiff argues that the Board wrongfully relied on the "Purposes" section of the Zoning Ordinance, specifically Sections 1.2, 1.3, 1.5, 1.6 and 1.11, in support of its conclusion that Omnipoint was not entitled to a special permit. Although it would be improper for the Board to rely solely on the general purposes of the Zoning Ordinance, it is not improper to rely on the purposes section of an ordinance in conjunction with its more specific standards. *See Veysey v. Zoning Bd. of Appeals of the City of Glens Falls,* 154 A.D.2d 819, 820–21, 546 N.Y.S.2d 254, 255 (N.Y.App.Div.1989) (finding that a general policy statement in a zoning ordinance is a valid factor in the board's determination); *Moriarty v. Planning Bd. of Village of Sloatsburg,* 119 A.D.2d 188, 198, 506 N.Y.S.2d 184, 190 (N.Y.App.Div.1986), *lv. denied* 69 N.Y.2d 603, 512 N.Y.S.2d 1026, 504 N.E.2d 396 (1987) (finding that a general purpose of an ordinance must be limited by the more specific purposes enunciated in the ordinance).

In its Decision, the Board did not base its denial of plaintiff's application for a special permit solely on the general purposes of the Zoning Ordinance. It cited and relied upon the relevant specific provisions of the Zoning Ordinance as well. The Zoning Ordinance must be read as a whole, and all parts harmonized to attain the legislative purpose and to avoid rendering any part surplusage. *Glens Falls,* 154 A.D.2d at 821, 546 N.Y.S.2d 254 (citing *Briar Hill Lanes v. Town of Ossining Zoning Bd. of Appeals,* 142 A.D.2d 578, 581, 529 N.Y.S.2d 911 (N.Y.App.Div.1988)). *See also Town of Brookfield,* 112 F.Supp.2d at 240 (finding that under Connecticut law, the Zoning Commission may base its denial on the purpose statement of a zoning ordinance "only in conjunction with, and not as an alternative to, the substantive standards set forth"). Thus, there was nothing improper about the Board's invocation of the "Purposes" section of the Ordinance.

(2) Alleged failure to establish a public necessity for the Facility

■ The Board found that Omnipoint had not established a "public necessity," as required by the Zoning Ordinance.

In its Decision, the Board concluded that Omnipoint failed to comply with Sections 6.7.12.1 of the Zoning Ordinance because it did not establish a "public necessity" for the proposed Facility. Section 6.7.12.1 provides that "When proposed in a residential district, 'public utility' 'buildings' or 'structures' shall be subject to a finding, in addition to the standards of Section 6.5 [general standards], that a public necessity exists for such 'use,' and that 'use' of the particular site for which the application is made is necessary from the public standpoint." In its findings pursu-

ant to Section 6.7.12.1, the Board acknowledged the submission of an engineering report "which states there is a gap in Omnipoint's coverage in the project vicinity," but relied on the testimony and letters from the public "stating that cellular telephones serviced by Omnipoint, Verizon and AT & T currently operate in the project vicinity,." [Decision, p. 23], to support its finding against Omnipoint.

Omnipoint claims that the Board's findings on this point were not supported by substantial evidence. In particular, it contends that there is no evidence that Omnipoint has coverage in the vicinity. In its Decision, the Board identified only two letters—a scintilla of evidence if ever there was one—from the public attesting to existing cell phone coverage. [Decision, p. 11.] However, the authors of these letters state that Verizon and AT & T cell phones operate in the vicinity. *Id.* Since the Board did not cite to evidence of Omnipoint coverage in the area, and defendants have not cited to the Record in support of this proposition, I must conclude that there is no evidence that Omnipoint customers have adequate service in the area.

Omnipoint also argues that the Board incorrectly relied on evidence that was not pertinent to the analysis required by the Zoning Ordinance under New York law. Furthermore, Omnipoint argues that, even if the evidence relied on by the Board was relevant, it did not constitute "substantial evidence" in light of the entirety of the evidence.

Finally, Omnipoint argues that the Board erroneously relied on inapplicable law and ignored the correct definition of the words "public necessity" in the Zoning Ordinance.

Omnipoint is correct on all counts.

Cell towers are public utilities. "It has long been held that a zoning board may not exclude a utility from a community when the utility has shown a need for its facilities." *Cellular Tel. Co. v.. Rosenberg,* 82 N.Y.2d 364, 371, 604 N.Y.S.2d 895, 624 N.E.2d 990 (1993) (quoting *Consolidated Edison Co. of New York, Inc. v. Hoffman,* 43 N.Y.2d 598, 611, 403 N.Y.S.2d 193, 374 N.E.2d 105 (1978)). New York courts have ruled that there is a necessity for a new cell tower when there is a service gap for a particular provider in a particular service area. *Cellular Tel. Co.,* 82 N.Y.2d at 371, 604 N.Y.S.2d 895, 624 N.E.2d 990. *Cf. Sprint Spectrum, L.P. v. Willoth,* 176 F.3d 630, 647–48 (2d Cir.1999); *Sprint Spectrum, L.P. v. Zoning Bd. of Appeals of Guilderland,* 173 Misc.2d 874, 662 N.Y.S.2d 717, 719 (N.Y.Sup.Ct.1997).

In its Decision, the Board argued that courts have "interpreted the [TCA] to protect service providers from discrimination by approving agencies, but it does not guarantee 'seamless coverage' to every carrier," and cited to *APT Pittsburgh Ltd. Partnership v. Penn Township Butler County of Pennsylvania,* 196 F.3d 469 (3d Cir.1999) and *Omnipoint v. Newtown,* 219 F.3d 240 (3d Cir.2000), *cert. denied,* 531 U.S. 985, 121 S.Ct. 441, 148 L.Ed.2d 446 (2000). [Decision, p. 23.] In its Decision, the Board extrapolated from these Third Circuit cases the proposition that there can be no public necessity for a cell tower as long as some wireless service provider operates in the vicinity.

However, that proposition is clearly not true under the Zoning Ordinance's "public necessity" requirement, which must be interpreted in light of New York law.

In *Cellular Tel. Co.,* Cellular One brought an Article 78 proceeding seeking review of the Dobbs Ferry Planning Board's denial of its application for a permit to construct a cellular telephone cell site. *Id.,* 82 N.Y.2d at 368, 604 N.Y.S.2d 895, 624 N.E.2d 990. This new cell site would enable Cellular One to expand and fill gaps in its service area. *Id.* Following

the submission of Cellular One's application, the Planning Board held a series of public hearings regarding the application. The Planning Board denied the application, finding that Cellular One had offered insufficient evidence to establish, among other things, "that there exists a public necessity for its service, or what the need of the broader public is relating to such service, or that it is a public utility relating to the zoning ordinance." *Id.* at 370, 604 N.Y.S.2d 895, 624 N.E.2d 990.

A CPLR Article 78 proceeding followed, challenging the Planning Board's determination. Cellular One alleged that the Planning Board's denial was arbitrary and capricious, unsupported by the record, not supported by substantial evidence, and contrary to law. *Id.* Specifically, Cellular One "asserted that the Board failed to apply the appropriate standard of public necessity set forth in *Matter of Consolidated Edison Co. v. Hoffman*, 43 N.Y.2d 598, 403 N.Y.S.2d 193, 374 N.E.2d 105 (1978)." *Id.*

The New York Supreme Court granted plaintiff's Article 78 petition, and directed the Planning Board to issue the permit, finding that the Planning Board's decision was "significantly flawed in its analysis and conclusions" and "arbitrary and capricious." *Id.* The Appellate Division affirmed. *Id.*

On appeal, appellants argued that the Supreme Court and the Appellate Division improperly applied the "public utility" exception to the unnecessary hardship test set forth in *Matter of Consolidated Edison*. *Id.*, at 372, 403 N.Y.S.2d 193, 374 N.E.2d 105. The test created by the Court of Appeals in *Matter of Consolidated Edison* provides that a public utility must show that the use requested "is a public necessity in that it is required to render safe and adequate service, and that there are compelling reasons, economic or otherwise, which make it more feasible to modify the plant than to use alternative sources of power such as may be provided by other facilities." *Matter of Consolidated Edison*, 43 N.Y.2d at 611, 403 N.Y.S.2d 193, 374 N.E.2d 105.

The Court of Appeals ruled that (1) cellular telephone companies are "public utilities"; (2) the *Matter of Consolidated Edison* test applies to all public utilities; and, (3) the *Matter of Consolidated Edison* test applies to entirely new sitings of facilities, as well as modifications of existing facilities. *Cellular Tel. Co.*, 82 N.Y.2d at 372, 604 N.Y.S.2d 895, 624 N.E.2d 990. Furthermore, the Court restated its holding in the *Matter of Consolidated Edison* that "a zoning board may not exclude a utility from a community where the utility has shown a need for its facilities." *Id.* In light of these findings, the Court held that Cellular One proved the requisite public necessity for its new cell site by establishing "that the erection of the cell site would enable it to remedy gaps in *its service* area that currently prevent it from providing adequate service to *its customers* in the Dobbs Ferry area." *Id.*, at 374, 604 N.Y.S.2d 895, 624 N.E.2d 990 (emphasis added).

*Cellular Tel. Co.* thus established that wireless service providers must demonstrate that its proposed tower would remedy gaps in a particular provider's service area in order to prove that the tower is a "public necessity."

This rule of law has been recognized by White Plains in connection with prior applications. For example, in its Kensico Road Decision, the Board found that, in accordance with the Zoning Ordinance, "[t]he Applicant is licensed by the [FCC] and the New York State Public Service Commission and is required under said license to provide continuous service. The Applicant has indicated that the site was selected to fulfill its FCC mandate to

expand and fill gaps in *its* service area. (emphasis added) Presently, due to large intervals between existing sites, *the Applicant* cannot adequately transmit or receive calls in the area of the site. (emphasis added) Calls of customers in the area are often interrupted or disconnected due to the lack of a site in the area. In addition, cross-talk and intermodulation render inaudible any calls which are connected. *Therefore, a public necessity exists for this use at the site.*" [Kensico Road Decision, p. 7. (emphasis added).]

In the Kensico Road Decision, there is no indication that any evidence was presented regarding any other service provider. The Board found there to be a public necessity under the Ordinance based solely on the applicant's inability to service the area. The Board, in compliance with *Cellular Tel. Co., explicitly* found that the existence of a gap in an individual provider's coverage, combined with an FCC mandate to fulfill all gaps in coverage, created a public necessity. The Board in this case offered no explanation of why Omnipoint was subjected to a different standard.

Obviously, the Third Circuit was not confronted in *APT* or *Newtown*, with the meaning of the term "public necessity" under the law of the state of New York. Those cases are, therefore, inapposite, and the Board improperly relied on them in support of its findings.

The proper test under the Zoning Ordinance for establishing that a public necessity exists pursuant to Section 6.7.12.1 is whether the wireless service provider has proven that there is a gap in its existing coverage that this new structure would fill. *See Cellular Telephone Co.,* 82 N.Y.2d at

374, 604 N.Y.S.2d 895, 624 N.E.2d 990. Therefore, evidence which establishes that other wireless service providers have coverage in the area is not relevant in a determination of whether Omnipoint has presented sufficient evidence to establish a finding of a public necessity for its proposed Facility under state law, as codified in the Zoning Ordinance.

I must now determine whether there was substantial evidence to support the Board's finding under the *Cellular Tel. Co.* definition of "public necessity." There was not. The only evidence the Board cited to in support of its finding that there was no "public necessity" for Omnipoint's proposed Facility was the submission of "testimony and . . . letters from the public stating that cellular telephones serviced by Omnipoint, Verizon, and AT & T currently operate in the project vicinity." As noted above, there is no such letter relating to Omnipoint's ability to operate in the area, which—under New York's definition of "public necessity"—is all that would matter. Neither in its decision, nor during the course of this action, did the Board cite to anything in the record to support its conclusion.

Thus the only evidence in the record on the public necessity question is Omnipoint's very substantial evidence of a scientifically documented coverage gap in its service. On this basis alone, the Board violated the TCA.[7]

(3) Concern regarding the visual/aesthetic impact on the community

■ The Board emphasized throughout the hearings and in the Decision its con-

---

7. Although a board may deny an application because it does not believe expert testimony, it has the burden of supporting its decision not to believe the expert testimony with substantial evidence in the record. *SBA Communications, Inc. v. Zoning Comm'n of the Town*

*of Brookfield,* 112 F.Supp.2d 233, 240 (D.Conn.2000). There was no relevant evidence opposing the engineering reports and testimony. The Board had no basis for rejecting plaintiff's expert engineering reports.

cern that the Facility would have an adverse visual impact on the community. Aesthetic concerns may provide a valid basis for zoning decisions. *Town of Oyster Bay,* 166 F.3d at 494. However, a few generalized expressions of concern with the adverse visual impact of the Facility cannot serve as substantial evidence on which the Board could base its denial. *Id.* at 496.

Defendants argue that the aesthetic concerns expressed by residents and congregants of Kol Ami, along with the study by Charles P. May & Associates, were sufficient to satisfy the substantial evidence standard. Omnipoint argues that the uninformed opinions of the residents and congregants do not overcome the extensive expert studies performed by Donna Stipo. Omnipoint also argues that its experts successfully neutralized the impact of the May study during its rebuttal.

In arriving at its Decision, the Board disregarded Ms. Stipo's expert reports and testimony, and placed great reliance on the residents' and congregants' views. The Board's dismissal of Stipo's findings, both from her crane tests and from her logistical studies, was improper. The Board "determined that the photo simulations are of limited value in assessing the aesthetic impact of the proposed tower because they were taken from a limited number of viewpoints on public property." [Decision, p. 19.] The Board also found that Omnipoint's failure to invite the Board to participate in the crane testing "alone can lead to an inference that the visual impact analysis testing demonstrated that no measures could mitigate the visual impact of the proposed monopole." [Decision, p. 23.]

These "findings" are improper. Ms. Stipo prepared a thorough and detailed report of the visual impact of the proposed Facility from many public locations in a one mile radius around the proposed site. She is an expert in her field and no allegations of impropriety or bias were imputed to her. The Board's implications of chicanery are unfounded, and could be viewed as a reflection of an unacceptable bias on the part of the Board. As stated above, although a board may deny an application because it does not believe expert testimony, it has the burden of supporting its decision not to believe the expert testimony with substantial evidence in the record. *Brookfield,* 112 F.Supp.2d at 240

The only substantive evidence presented to the Board to counter the Stipo reports and testimony was the study by May & Associates. Omnipoint argues that the May report was unreliable. Omnipoint is correct. May's submission disregarded that actual topography of the area, the existing trees and the existing structures. Additionally, May did not employ the advanced technology used by Stipo. The graphs and expert testimony submitted by Omnipoint to rebut the May study demonstrated the serious flaws in the May study. I find that the May study does not constitute substantial evidence of an adverse visual impact.

While the Board rejected Stipo's detailed studies, it appears to have accepted without question the unsupported fears of local residents, whose views can only be based on speculation since (1) they have never seen the monopole (as it has not yet been built), and (2) they propounded no countervailing photo simulations of their own. As in *Town of Oyster Bay,* the aesthetic concerns expressed by residents reveal that these residents did not understand what the proposed Facility would actually look like, and where it would be seen. The tests performed by Ms. Stipo, however, provided substantial evidence that the visual impact would be minimal, and that the site of the proposed Facility is the least intrusive means of filling Omnipoint's coverage gap. The Board acted

improperly in finding that the proposed Facility was not the least intrusive means of filling Omnipoint's coverage gap, and in concluding that the Facility would have a more than minimal adverse visual impact on the community.

### (4) Concerns regarding residential property value

■ The Board argues that residents' concerns regarding the negative impact on residential property values, and a letter and testimony from a local real estate agent and appraiser, constituted substantial evidence that property values would decrease if the Facility were constructed. The court disagrees.

Neither the Board nor the residents offered expert evidence that the proposed Facility would cause a decrease in property values. Omnipoint, however, presented an expert report from Lane Appraisals stating that the Facility would have no impact on the property value of nearby homes. Lane Appraisals studied the sale of over eighty homes in close proximity to cell towers, and concluded that there was no decrease in property values as a result of the cell towers. In the face of expert testimony, unsupported constituent testimony opposing cellular tower location generally will not satisfy the substantial evidence test. *See SBA Communications, Inc. v. Zoning Comm'n of the Town of Franklin,* 164 F.Supp.2d 280, 292 (D.Conn. 2001); *PrimeCo Personal Communications, L.P. v. Village of Fox Lake,* 26 F.Supp.2d 1052, 1063 (N.D.Ill.1998).

Residents, the realtor and the appraiser all offered unsubstantiated opinions that property values would decrease, and offered no evidence to prove how they reached their conclusions. General, unsupported assertions by residents and realtors that property values would decrease do not constitute substantial evidence in light of a report and testimony of a real

estate appraiser who found, after a detailed study, that the construction of cell towers had no impact on property values. *See Town of Oyster Bay,* 166 F.3d at 496; *SiteTech Group Ltd. v. Bd. of Zoning Appeals of the Town of Brookhaven,* 140 F.Supp.2d 255, 262–63 (E.D.N.Y.2001); *PrimeCo,* 26 F.Supp.2d at 1063. These unpersuasive resident concerns, in light of Omnipoint's expert report and testimony, are not "adequate to support a conclusion," *Universal Camera,* 340 U.S. at 477, 71 S.Ct. 456, 95 L.Ed. 456, that the special permit should be denied.

I conclude that the Board's denial of Omnipoint's application for a special permit and all other necessary permits was not supported by substantial evidence as required by 47 U.S.C. § 332(c)(7)(A)(iii). Plaintiff's motion for summary judgment of liability on Count I is granted; Defendants' cross-motion to dismiss the Count is denied.

### V. *Unreasonable Discrimination Claim (Count II)*

■ Omnipoint alleges that the Town "unreasonably discriminate[d] among providers of functionally equivalent services" in violation of § 332(c)(7)(B)(i)(I). As a threshold matter, Omnipoint must show that defendants discriminated among providers of functionally equivalent services and that these providers were treated unequally. *Nextel Partners of Upstate New York, Inc. v. Town of Canaan,* 62 F.Supp.2d 691, 698 (N.D.N.Y.1999). Defendants move for summary judgment on this claim, on the ground that Omnipoint has offered no such proof.

The record is on this issue is virtually non-existent. However, in support of its unreasonable discrimination claim, Omnipoint points to the prior Kensico Road and North Street Decisions of the Board. These decisions, issued in February 1995 and June 1998, granted SMSA Limited

718

Partnership, a wireless service provider, special permits to build cellular utility towers on Kensico Road and on North Street. Omnipoint asserts that the Board applied different and more strenuous standards to Omnipoint's Application than to the two prior applications with respect to (1) the purposes of the Ordinance, (2) the effect of photo simulations; (3) the standard for public necessity determination; and, (4) the ability to mitigate visual impact, [Pl. Reply, p. 22], and that these more stringent standards led to the denial of their Application.

"[T]he [TCA] explicitly contemplates that some discrimination among providers of functionally equivalent services is allowed. Any discrimination need only be reasonable." *Willoth,* 176 F.3d at 638 (*quoting AT & T Wireless PCS, Inc. v. City Council of Va. Beach,* 155 F.3d 423, 427 (4th Cir.1998) (internal quotation marks omitted)). Under the TCA, local governments may reasonably consider the location of the cell tower in deciding the nature of the inquiry to be made, and whether to approve the application for construction. *Id.* at 639. The legislative history of the TCA contemplated some discrimination would occur, noting that the "unreasonable discrimination" standard "will provide localities with the flexibility to treat facilities that create different visu-

al, aesthetic, or safety concerns differently to the extent permitted under generally applicable zoning requirements even if those facilities provide functionally equivalent services." H.R.Conf. No. 104–458, at 208, *reprinted in* 1996 U.S.C.C.A.N. at 222.

As defendants point out, Omnipoint's Application for its proposed Facility did differ significantly from the two prior Applications. Omnipoint proposed the construction of a Facility 150 feet in height, and located on a golf course only a few hundred feet from expensive residential homes. The prior Applications proposed Facilities that were somewhat different in size and in location. However, I cannot determine on this paltry record whether the applicants were truly "differently situated" as to eliminate any possible Equal Protection claim.[8]

The fact that the applications differed, however, is not sufficient to defeat a claim of unreasonable discrimination. Some providers got their permits. Omnipoint did not. There is a disputed issue of material fact. Summary judgment is denied.

VI. *Prohibition of Wireless Service Claim (Count III)*

■ Defendants have moved for summary judgment on all of plaintiff's remaining claims—Counts II, III, IV[9], and VI of

8. This differentiates the instant case from *Harlen Assoc. v. The Incorporated Village of Mineola and Board of Trustees for the Incorporated Village of Mineola,* 273 F.3d 494, —— (2d Cir.2001), in which the Second Circuit affirmed the dismissal of a claim for an equal protection violation based on discrimination among convenience store operators in applications for permits. The district court found, as a matter of undisputed fact, that the providers were not similarly situated because the concerns relied on by the board to turn down the permit—proximity to a school and a dangerous crosswalk—were not at issue in those cases where permits had been granted to other convenience stores owners. Thus, plaintiff

and the other providers were not "similarly situated." The Court of Appeals affirmed.

9. Omnipoint agrees that Count IV, which alleges that the Board unreasonably delayed its processing of Omnipoint's application in violation of 47 U.S.C. § 332(c)(7)(B)(ii), should be dismissed. [Pl. Reply, p. 5, fn. 2.] I agree. As I stated in an earlier opinion, "Congress could not have intended for plaintiffs to bring a claim that a Board's action was both a final denial of their application and a delay that had the effect of a denial. By waiting until after the final decision was rendered, Plaintiffs forwent a claim of 'unreasonable delay.'" *Town of Clarkstown,* 99 F.Supp.2d 381, 395

the Complaint. Plaintiff opposes the motion.

Omnipoint contends that the Decision "prohibits or has the effect of prohibiting the provision of personal wireless services" in violation of 47 U.S.C. § 332(c)(7)(B)(i)(II). Defendants, in moving for summary judgment, contend that the record contains no evidence of total prohibition of cellular service in the area. I agree.

In *Sprint Spectrum, L.P. v. Willoth*, 176 F.3d 630, 647–48 (2d Cir.1999), the Second Circuit, following a lengthy analysis of the TCA, which included a "detailed parsing of the statutory language, including layers of highly technical definitions," concluded that "the Act's ban on prohibiting personal wireless services precludes denying an application for a facility that is the least intrusive means for closing a significant gap in a *remote user's* ability to reach a cell site that provides access to land-lines." *Willoth*, 176 F.3d at 643 (emphasis added); *Omnipoint Communications, Inc. v. Port Authority of New York and New Jersey*, 1999 WL 494120, 99 Civ. 0060, at *12 (S.D.N.Y. July 13, 1999) (noting that *Willoth* makes clear that "once any wireless carrier provides service to a given area ... there is no prohibition on the provision of wireless services"). In *Port Authority of New York and New Jersey*, another judge of this court similarly found that, since other service providers, namely AT & T and BAM, already provided service in the contested area, the defendants had not prohibited wireless service within the meaning of the TCA. *Id.*

In this action, it is clear from the record that (1) there exists a significant gap in Omnipoint's coverage; and, (2) the construction of the proposed Facility is the least intrusive means for closing Omnipoint's coverage gap. What is not clear from the record is whether there is a significant gap "in a remote user's ability to reach a cell site that provides access to land-lines." *See Willoth*, 176 F.3d at 643.

The only evidence provided by defendants in support of the proposition that other cell providers have coverage in the area are the two letters from residents indicating that they can use their Verizon and AT & T cell phones in the area. Plaintiff introduced no evidence whatsoever to prove that other providers were unable to operate in White Plains, as is required to meet the *Willoth* standard. Defendants, as the moving party, have satisfied their burden by showing that there is a lack of evidence to support the nonmoving party's claim. *See Celotex Corp. v. Catrett*, 477 U.S. 317, 325, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). Omnipoint has failed to set forth "specific facts showing that there is a genuine issue for a trial" sufficient to withstand a motion for summary judgment. Fed.R.Civ.P. 56(e).

## VII. *Section 1983 Claim (Count VI)*

Plaintiff's claim under § 1983 is subsumed by the requests for damages in Count I and II.

## CONCLUSION

For the reasons stated above, Omnipoint's Motion for Partial Summary Judgment on liability is granted as to Count I. Defendants' Motion for Summary Judgment dismissing Counts III, IV and V is granted. Defendants Motion for Summary Judgment dismissing Counts II and VI is denied. Discovery will proceed in accordance with the attached expedited

(S.D.N.Y.2000). Whether White Plains misled Omnipoint into joining in requests that I delay adjudication of this motion while the clock ran and the Fenway lease option expired does not raise an issue under the TCA, and is therefore not implicated in Count IV.

schedule. No adjournments will be granted for any reason.

This constitutes the decision and order of the Court