OMNIPOINT COMMUNICATIONS, INC., Plaintiff–Appellee,

v.

THE CITY OF WHITE PLAINS, Defendant–Appellant,

The Planning Board of The City of White Plains, Mary Cavellero, James J. Gould, Russell Imlay, John Garment, Terrence Guerriere, Robert Stackpole and Juan Carlos Roskell, Defendants,

Congregation Kol Ami, A New York Religious Corporation, Movant.

Docket No. 04–3286–CV.

United States Court of Appeals, Second Circuit.

Argued: June 6, 2005.

Decided: Dec. 2, 2005.

Joseph A. Maria, Joseph A. Maria, P.C., White Plains, N.Y. (Frances Dapice Marinelli, on the brief) for Defendant–Appellant.

Eric S. Aronson, Greenberg Traurig, LLP, Florham Park, NJ (Helen E. Kleiner, Jeffrey W. Greene, on the brief) for Plaintiff–Appellee.

Before: WALKER, Chief Judge, JACOBS and LEVAL, Circuit Judges.

JACOBS, Circuit Judge.

Omnipoint Communications, Inc., a cellular telephone provider, is suing the City of White Plains (the "City" or "White Plains") and its Planning Board (the "Board") alleging (*inter alia*) violations of the Federal Telecommunications Act ("the TCA"), 47 U.S.C. § 332, arising from the Board's denial of Omnipoint's application for a permit to erect a 150–foot cellular communications tower (disguised as a large tree) on a local golf course. On

Omnipoint's motion for summary judgment, the United States District Court for the Southern District of New York (McMahon, *J.*) ruled that the Board's decision was unsupported by substantial evidence and therefore in violation of the TCA. *Omnipoint Commc'ns v. City of White Plains*, 175 F.Supp.2d 697, 711–17 (S.D.N.Y.2001). Following a damages trial, White Plains was ordered to pay $1,327,665.24 in actual damages (plus post-judgment interest) and $231,152.84 in attorneys' fees. *Omnipoint Commc'ns v. City of White Plains*, 01 Civ. 3285, at 6 (S.D.N.Y. May 6, 2004) (Yanthis, *M.J.*) (memorandum decision and order awarding damages and attorneys' fees). On appeal by the City, we conclude that the Board's decision was supported by substantial evidence, and reverse.

## I

The TCA limits state and local regulation "of the placement, construction, and modification of personal wireless service facilities." 47 U.S.C. § 332(c)(7). Such regulation "(I) shall not unreasonably discriminate among providers of functionally equivalent services; and (II) shall not prohibit or have the effect of prohibiting the provision of personal wireless services." *Id.* § 332(c)(7)(B)(i). Further, state and local governments must act on applications "within a reasonable period of time" and may not deny such an application except in a written decision "supported by *substantial evidence* contained in a written record." *Id.* § 332(c)(7)(B) (emphasis added).

A savings clause in the TCA provides that, subject to five specific limitations, *see id.* §§ 332(c)(7)(B)(i)-(v), local governments retain express control over the zoning of wireless services facilities:

> Except as provided in this paragraph, nothing in this chapter shall limit or affect the authority of a State or local government or instrumentality thereof over decisions regarding the placement, construction, and modification of personal wireless service facilities.

*Id.* § 332(c)(7)(A). The TCA thus strikes a balance between "two competing aims— to facilitate nationally the growth of wireless telephone service and to maintain substantial local control over siting of towers." *Town of Amherst, N.H. v. Omnipoint Commc'ns*, 173 F.3d 9, 13 (1st Cir.1999).

## II

Omnipoint is a wireless cell phone provider licensed by the Federal Communications Commission ("FCC"). In an effort to close a coverage gap, Omnipoint decided to build a 150–foot telecommunications tower in White Plains, New York. Imitation branches would be affixed to the cylindrical tower in order to dress it up as an evergreen tree.

On October 19, 1999, Omnipoint signed an Agreement with Fenway Golf Club ("Fenway"), located on the border of White Plains and the Village of Scarsdale, to lease a site for the tower. The Agreement afforded Omnipoint an "Option Period" of two years to obtain government approval for the proposed tower, failing which Fenway had a unilateral right to terminate.

In June 2000, Omnipoint applied—on Fenway's behalf—for a special permit from the Board. At the public hearings, there was little question that there is a gap in Omnipoint coverage; the controversy was over the proposed solution. Omnipoint reassured the Board that the proposed tower would have minimal visual impact on the community because a tower disguised as a tree would blend in, camouflaged by the local "mature and deciduous tree line." *Omnipoint Commc'ns*, 175 F.Supp.2d at 701. An Omnipoint expert

did a visual-impact study, parking a 150–foot crane at the proposed site, and touring the public roads of the neighborhood to ascertain whether and where the crane was visible. The study concluded that, except for a single property, the crane would be invisible or unnoticeable outside the golf course. Illustrative photographs were taken from the public streets. As the Board pointedly noted, however, residents were not invited to participate in the study, or notified of it.

Public hearings continued monthly from July 2000 through March 2001. Throughout, neighbors argued that the tower would be an eyesore. Nearby Temple Kol Ami contended that the tower would cause parents to withdraw their students from its nursery school, and would impair the view from its glass-enclosed chapel. The neighbors' expert testified that a 150–foot tower cannot effectively be disguised as an evergreen in a neighborhood where the tallest evergreen is just 51 feet high. According to other testimony (credited by the Board), the tower would be at least 50 feet taller than the tallest deciduous trees in the landscape. Other experts testified on the neighbors' behalf regarding the anticipated diminution in property values.

The Board announced its intention to deny Omnipoint's application at the January 2001 meeting, and formally denied the application in a 25–page resolution adopted at the meeting in March 2001. *See infra.* Within weeks, Omnipoint sued, alleging that the Board violated the TCA and New York Civil Practice Laws and Rules Article 78, and seeking damages pursuant to 47 U.S.C. § 1983.

Later—one day before the October 19, 2001 expiration of the Option Period—Fenway executed a formal agreement with residents, whereby Fenway agreed not to allow the construction of cell towers in exchange for the residents' acquiescence in Fenway's contested proposal for a maintenance facility. The next day, Fenway terminated the Omnipoint Agreement. Less than two months later, on December 3, 2001, Fenway's Maintenance Facility Application was approved by the Board.

In December 2001, the district court decided the parties' summary judgment motions. *Omnipoint Commc'ns,* 175 F.Supp.2d 697. On Omnipoint's motion for summary judgment on Count I, the district court ruled that the Board's decision was unsupported by substantial evidence, *id.* at 711–17, a ruling we now reverse. The district court's other rulings on the other claims are not at issue on appeal.[1]

Magistrate Judge Yanthis conducted a damages trial on the § 1983 substantial evidence claim, and in February 2004 directed entry of judgment in the amount of $1,327,665.24, consisting of damages for costs incurred during the zoning process, damages for lost revenue, damages for the expense of locating an alternative site, and $231,152.84 in attorneys' fees.

### III

We review the district court's summary judgment decision *de novo, see Young v. County of Fulton,* 160 F.3d 899, 902 (2d

---

1. The district court denied summary judgment on Count II (alleging unreasonable discrimination in violation of the TCA), *id.* at 717–18, which Omnipoint subsequently withdrew. On the City's motion for summary judgment, the district court dismissed Omnipoint's remaining liability claims (Counts III, IV, and V) and ruled that Omnipoint's § 1983 damages claim (Count VI) is subsumed by the requests for damages in Counts I and II. The rulings as to those counts are not challenged on appeal. *Norton v. Sam's Club,* 145 F.3d 114, 117 (2d Cir.1998) ("Issues not sufficiently argued in the briefs are considered waived and normally will not be addressed on appeal.").

Cir.1998), and the Board's decision for substantial evidence, *see* 47 U.S.C. § 332(c)(7)(B)(iii) ("Any decision by a State or local government or instrumentality thereof to deny a request to place, construct, or modify personal wireless service facilities shall be in writing and supported by substantial evidence contained in a written record."). The latter is a deferential standard, and courts "may neither engage in [their] own fact-finding nor supplant the [ ] Board's reasonable determinations.... Substantial evidence, in the usual context, has been construed to mean less than a preponderance, but more than a scintilla of evidence." *Cellular Tel. Co. v. Town of Oyster Bay*, 166 F.3d 490, 494 (2d Cir.1999) (internal citation omitted). Substantial evidence is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Id.* (citation omitted).

The Board's resolution focused on three considerations: (1) adverse visual impact; (2) diminution of property values; and (3) lack of "public necessity."

## A

■ As Omnipoint concedes, aesthetics is a permissible ground for denial of a permit under the TCA. *See Town of Oyster Bay*, 166 F.3d at 495 ("In New York, aesthetics can be a valid ground for local zoning decisions.").

■ Given the 150–foot tower would rise to three times the height of the tallest evergreen tree and would be half again as tall as any other tree in the area, the Board could reasonably conclude (especially given express testimony to that effect) that the tower would be widely visible. In addition, the Board received substantial evidence of the tower's adverse aesthetic impact. We have no difficulty concluding that the Board's rejection was based on reasonable and substantial evidence.

Omnipoint argues, however, that the Board erroneously focused on the statements by agitated neighbors and their expert, rather than on the testimony of Omnipoint's expert and her visual impact study. We disagree.

First, the Board was free to discount Omnipoint's study because it was conducted in a defective manner. The study concluded that the tower "would be visible from only one property outside the Golf Course." However, because the study was conducted without notice to the Board or community, the observation points upon which its conclusion was based were limited to locations accessible to the public— mostly public roads—and no observations were made from the residents' backyards, much less from their second story windows. Moreover, the study suffered from the further defect that it failed to consider the tower's visibility in winter, when deciduous trees are bare. Accordingly, the study did not foreclose a finding that the tower would be widely visible.[2]

Second, the Board was not bound to accept Omnipoint's expert testimony simply because (as Omnipoint contends) it was insufficiently contested by properly credentialed expert testimony. True, the residents' visual impact study was prepared by a landscape architect with limited qualification for that task; but the residents were not required to offer any expert testimony at all. More broadly, this Court has refused "to create by fiat a constitutional requirement that all zoning boards in this

---

**2.** Even a better study, however, might not have assuaged the Board's concern over the visual impact of a man-made evergreen of this scale. As the Board argues, a similar structure along New York's Hutchinson River Parkway has become a Westchester landmark well-known to area commuters.

Circuit use expert testimony or written studies to support their decisions." *Harlen Assocs. v. Inc. Vill. of Mineola,* 273 F.3d 494, 501 n. 3 (2d Cir.2001).

Third, we reject Omnipoint's argument that the Board gave improper deference to community opposition. In *Town of Oyster Bay,* 166 F.3d at 495–96, we declined to rule whether constituent comments amount to substantial evidence, and noted tension between *Omnipoint Corp. v. Zoning Hearing Bd.,* 20 F.Supp.2d 875, 880 (E.D.Pa.1998) (holding that "unsubstantiated personal opinions" expressing "[g]eneralized concerns ... about the aesthetic and visual impacts on the neighborhood do not amount to substantial evidence"), and *AT & T Wireless PCS v. City Council of Va. Beach,* 155 F.3d 423, 430 (4th Cir.1998) (holding that neighbors' aesthetic concerns could constitute "compelling" evidence for a city council). In this case, some of the residents' comments may amount to no more than generalized hostility, such as the objection that the tower was being dumped on them rather than on their more affluent neighbors in Scarsdale. At the same time, however, we conclude that the Board had discretion to rely (as it did) on aesthetic objections raised by neighbors who know the local terrain and the sightlines of their own homes. The Fourth Circuit observed in *AT & T Wireless PCS* that "the repeated and widespread opposition of a majority of the citizens ... who voiced their views—at the Planning Commission hearing, through petitions, through letters, and at the City Council meeting—amounts to far more than a 'mere scintilla' of evidence to persuade a reasonable mind to oppose the application." 155 F.3d at 431. We need not go as far as the Fourth Circuit, however, to decide this case.

Here, the observations of self-interested neighbors conflict with an expert study submitted by a self-interested applicant. Though a board is not required to give decisive weight to one over the other, Congress has definitely provided it the ultimate voice in the zoning decision-making process. *See id.* ("Appellees, by urging us to hold that such a predictable barrage mandates that local governments approve applications, effectively demand that we interpret the Act so as always to thwart average, nonexpert citizens; that is to thwart democracy."); 47 U.S.C. § 332(c)(7)(A).

Omnipoint urges that the residents' objections are tainted by the community's long-standing problems with the golf course, and therefore should have been given no weight. Many residents had long complained about the golf course for reasons unrelated to the proposed tower, including the stench of compost and the noise of maintenance equipment. This argument bears on the weight of the objections raised by some residents, but it does not render all the objections unsubstantiated as a matter of law.

Omnipoint charges that the Board colluded with Fenway to allow the Option Period to expire. There is no evidence, however, that the Board was aware of the Option Period clause or its term; indeed, the record reflects that Omnipoint refused to give the Board a copy of the Agreement. And although Fenway secured the neighbors' acquiescence to the maintenance facility the day before the Option Period was due to expire (and was not renewed), there is no evidence that any machinations by Fenway are imputable to the Board.

**B**

The Board credited expert testimony that the tower's adverse visual impact (combined with public perception that cell towers may pose health hazards) would

result in a decline in the marketability of homes in the neighborhood. We need not decide whether such testimony by itself would constitute substantial evidence. The Board's ruling on property values is closely related to its determination on aesthetics, and stands on much the same footing.

## C

■ Finally, the Board concluded that Omnipoint failed to demonstrate "public necessity" for the tower. In so doing, the Board applied the public necessity standard supplied by the Third Circuit in *Omnipoint Commc'ns v. Newtown*, 219 F.3d 240, 244 & n. 2 (3d Cir.2000), which requires the applicant to show that (1) there is a significant coverage gap in the area; and (2) the manner in which it plans to close the gap is the least intrusive means. We agree with Omnipoint that this was the wrong test, because the standard set forth in *Newtown* addresses the showing an applicant must make before TCA § 332(c)(7)(B)(i)(II) will *require* a planning board to grant its application.

The applicable standard was articulated by the New York Court of Appeals in *Consolidated Edison Co. v. Hoffman*, which concerns the showing that a utility must make under New York law before a zoning board *may* grant a use variance. 43 N.Y.2d 598, 611, 403 N.Y.S.2d 193, 374 N.E.2d 105 (1978); *see also Cellular Tel. Co. v. Rosenberg*, 82 N.Y.2d 364, 371, 604 N.Y.S.2d 895, 624 N.E.2d 990 (1993) (applying the *Consolidated Edison* test to cell phone company's application to build a new cell site). Under the *Consolidated Edison* "public necessity" standard, a utility must show that (1) its new construction "is a public necessity in that it is required to render safe and adequate service"; and (2) "there are compelling reasons, economic or otherwise, which make it more feasible" to build a new facility than to use "alternative sources of power such as may be provided by other facilities." *Id.* at 371–72, 604 N.Y.S.2d 895, 624 N.E.2d 990.

■ Thus, to establish necessity, Omnipoint had to demonstrate that there was a gap in cell service, and that building the proposed tower at the Fenway site was more feasible than other options. As to the first requirement, the City concedes that there is a "service gap for [Omnipoint's] particular service." This provokes the question whether the necessity can be demonstrated if other providers are meeting the need for cellular coverage, a point that seems to be unsettled.[3] We can avoid that question, however, because we con-

**3.** New York law suggests that a provider need only establish a gap in *its own* service regardless of whether cell service is available in the gap area from other carriers: In *Cellular Telephone Co.*, the New York Court of Appeals concluded that a cell phone company demonstrated the requisite "public necessity" by establishing "that the erection of the cell site would enable it to remedy gaps *in its service area* that currently prevent it from providing adequate service to *its customers.*" 82 N.Y.2d at 373–74, 604 N.Y.S.2d 895, 624 N.E.2d 990 (emphasis added). Our decision in *Sprint Spectrum L.P. v. Willoth* says that the TCA "precludes denying an application for a facility that is the least intrusive means for closing a significant gap in a remote *user's* ability to reach a cell site that provides access to landlines." 176 F.3d 630, 643 (2d Cir.1999) (emphasis added). It is unsettled whether, under the TCA, a coverage gap "must be measured from the perspective of the individual provider … or the perspective of users." *See Omnipoint Commc'ns, Inc. v. Vill. of Tarrytown Planning Bd.*, 302 F.Supp.2d 205, 217 (S.D.N.Y.2004) (comparing the First Circuit's approach, which looks at the gap from the provider's perspective, with that of the Third Circuit, which holds that the gap must exist from the perspective of the individual customer). We express no opinion on how these lines of state and federal law apply or interact.

clude that in any event Omnipoint did not meet its burden on the second *Consolidated Edison* requirement.

Omnipoint identified several other potential sites but stated in conclusory fashion that they were unfeasible.[4] Similarly, Omnipoint stated (without documentation) that it was unable to build a less intrusive structure or combination of structures at the Fenway site. However, the record is clear that other cell companies serve the area in which Omnipoint has its gap. From this, the Board could infer that other towers erected by other companies are in the vicinity, and that Omnipoint had the burden of showing either that those towers lacked capacity for an Omnipoint facility or that (for some other reason) those towers were unavailable to bridge Omnipoint's coverage gap. This is not a theoretical consideration, because one finding in the damages opinion is that "the cheapest way for Omnipoint to close its coverage gap would be to co-locate on an existing tower in the Fenway area." *Omnipoint Commc'ns*, 01 Civ. 3285, at 4. Although this alternative surfaced in the damages trial, and is not in the Board's administrative record, it was an available inference from the facts presented to the Board.

In short, we conclude that there was substantial evidence to support the Board's decision, and reverse the district court's ruling to the contrary.

## IV

■ Even if the Board's decision were unsupported by substantial evidence, we would be required to vacate the district

court's damages award, which relied exclusively on § 1983. The Supreme Court's intervening decision in *City of Rancho Palos Verdes v. Abrams*, 554 U.S. ——, 125 S.Ct. 1453, 161 L.Ed.2d 316 (2005), holds that § 1983 damages are not available for violations of the TCA. Specifically, the Court ruled that a private citizen could not use § 1983 to enforce the TCA against local authorities because Congress did not intend that § 1983 would supplement the judicial remedy expressly provided in the TCA. *Id.* at 1462. As to remedy, the TCA provides:

> Any person adversely affected by any final action or failure to act by a State or local government or any instrumentality thereof that is inconsistent with this subparagraph may, within 30 days after such action or failure to act, commence an action in any court of competent jurisdiction. The court shall hear and decide such action on an expedited basis. Any person adversely affected by an act or failure to act by a State or local government or any instrumentality thereof that is inconsistent with clause (iv) may petition the Commission for relief.

47 U.S.C. § 332(c)(7)(B)(v). The Supreme Court opinion does not say whether damages are available under the TCA itself, or what they would be. As acknowledged in *Abrams*, 125 S.Ct. at 1459–60 & n. 3, the Seventh Circuit has held that compensatory damages are "presumptively available" under the TCA, *PrimeCo Pers. Commc'ns v. City of Mequon*, 352 F.3d 1147, 1152–53 (7th Cir.2003), while the District of Massachusetts has held that the "appropriate

---

4. In a supplemental submission, compiled at the Board's request, Omnipoint listed six alternative scenarios (combining structures at several locations) that could close the coverage gap. According to the Board's resolution, however, Omnipoint's attorney "qualified the [supplemental submission] by stating that the

owners of the properties included [on the list] were not approached about the availability of their property for a cellular installation," and, as the Board found, Omnipoint "[made] no suggestion that any of [those] alternatives [were] feasible without the consent of a willing owner."

remedy for a violation of the TCA is a mandatory injunction," *Omnipoint Commc'ns MB Operations, LLC v. Town of Lincoln,* 107 F.Supp.2d 108, 120–21 (D.Mass.2000). However, this appeal does not turn on the creation of new law in this area, and we decline to reach this issue.

## CONCLUSION

For the foregoing reasons, we reverse the judgment of the district court.